Van Voorhis, J.
The science of genetics dates from Gregor Mendel, the Austrian monk whose experiments were published in 1865 and came to the general attention of biologists.in 1900. Not until the advent of nuclear warfare in 1945 did scientists or the public become aware of the hereditary effects of the exposure *113 of the genital organs of the human body to nuclear fallout and other forms of ionizing radiation. The catastrophic effects of Hiroshima and Nagasaki brought this subject into the foreground of popular discussion, and, on the scientific side, the studies and experiments in the structure of the atom pointed toward physiological chemistry (and physics) leading prominent scientists to the conclusion that ionizing radiation causes changes in the male and female genital organs capable of producing deleterious effects upon future generations. The details of these interesting and important concepts and experiments are for scientists rather than judges and lawyers. It is sufficient for present purposes that the record discloses the existence of a substantial quantity of reliable scientific opinion that future generations may sustain absence of portions of the brain, absence of a finger or ear or other bodily members, defects in the neuromuscular system, the circulatory system, the genito-urinary system, the gastro-intestinal system, the skin, or other deformities due to the effect of ionizing radiation, and that findings were made by the Referee and affirmed by the Appellate Division that taking X-ray pictures of the full spine, such as are commonly used by chiropractors, exposes the reproductive organs of the male or female patient to the direct, primary X-ray beam in quantity sufficient to damage the hereditary material of the individual from which the generations yet unborn are to come. The findings of this nature are based on testimony not only of the New York State Commissioner of Health, and the Deputy Commissioner, but also upon the testimony of the radiologist in chief of Johns Hopkins Hospital in Baltimore, Maryland, and a professor of biology who has specialized for more than three decades in genetics at Johns Hopkins University. Their testimony amply supports the explicit findings of the Referee and the Appellate Division that the effect of X-ray exposure to the reproductive life is deleterious, additive and cumulative. The bad effects, according to this testimony, vary according to the total of ionizing radiation to which the individual is subjected.
The expert testimony on which these findings are based is virtually uncontradicted. There is little in the record to reflect divergence of scientific opinion, but, assuming the existence of differences in views of scientists on the effects of radiation, it *114 is at least a subject upon which informed geneticists may reasonably differ. It is not for the courts to determine which scientific view is correct in ruling upon whether the police power has been properly exercised. “ The judicial function is exhausted with the discovery that the relation between means and end is not wholly vain and fanciful, an illusory pretense ’ ’ (Williams v. Mayor of Baltimore, 289 U. S. 36, 42; Hadacheek v. City of Los Angeles, 239 U. S. 394, 413-414).
Confronted by the * ‘ dangers of unnecessary uses of ionizing radiation ” the State Commissioner of Health testified that his department concerned itself “ with every conceivable source of ionizing radiation. We are not interested in just chiropractors, doctors, hospitals or factories. We want to cut out every single bit of unnecessary radiation ”.
These activities in the State Department of Health, the testimony indicates, commenced about 1954 and led, among other aspects, to studies in the use of X ray by chiropractors. The Commissioner testified that “ we weren’t concerned very much about the training of how to take a picture ”, inasmuch as “ sixteen weeks of training is quite sufficient to train a person of average intelligence how to press buttons, how to position the patient, how to develop a film so that you can get a good X-ray film.” Neither did the Commissioner “ question the ability of any chiropractor who goes to school for four years to learn how to take an X-ray film ” which the Commissioner stated could be learned in four weeks, if necessary. What did concern the Commissioner of Health and his department was how “ to cut down unnecessary ionizing radiation ’ ’ and, in this context, to discover “what contribution the chiropractors make to unnecessary radiation of the human body ’ ’. It was discovered to be customary for the average chiropractor, of whom there are about 2,500 in New York State, to take or have taken X rays of the full spinal column before administering to a patient for any kind of ailment. The record discloses, for example, that among the patients of two chiropractors who testified for plaintiffs 75% to 90% were X rayed as contrasted with less than 3% of the cases under medical supervision in Johns Hopkins Hospital. From data of thia nature it was concluded that the benefits derived from this kind of exposure were out of proportion to the hereditary damage to be anticipated from the wholesale use of X ray *115 in this field, by the same token whereby the use of fluoroscopes for shoe fitting had previously been forbidden and as subsequent action was taken by the New York City Board of Health to ban the sale of radium dial wrist watches. Limitations on the application of radiation to human beings, whether for their own protection or that of the unborn, is related to the protection of the public health under the police power on the same principle by which compulsory vaccination has been sustained in the public schools (Matter of Viemeister v. White, 179 N. Y. 235). The court there said per Vann, J. (p. 238): “ When the sole object and general tendency of legislation is to promote the public health, there is no invasion of the Constitution, even if the enforcement of the law interferes to some extent with liberty or property. These principles are so well established as to require no discussion and we cite but a few out of many authorities relating to the subject [citing cases].” The court took note that the result reached was not to be nullified by the circumstance that ‘ ‘ some laymen, both learned and unlearned, and some physicians of great skill and repute, do not believe that vaccination is a preventive of smallpox ” (p. 239). A similar principle underlies all of the legislation and sanitary code enactments relating to preventing the spread of communicable diseases by measures pursued without regard to the consent of the individual concerned.
The enactment which is challenged by plaintiffs in this suit was added to the New York State Sanitary Code in 1957, effective July 1,1958. It was added as regulation 19 to chapter XVI of the Sanitary Code on ionizing radiation first adopted in 1954. The relevant portions are as follows:
‘ ‘ Regulation 19. Limitations on application of radiation to humans.
“ No person shall apply radiation to a human being unless such person is licensed or otherwise authorized to practice medicine, dentistry, podiatry or osteopathy under the provisions of the Education Law of the State of New York. Radiation shall be applied by a licensed or otherwise authorized person to only those parts of the human body specified in the law under which such person is licensed or authorized to diagnose and treat.
“ This regulation shall not prohibit the use of radiation by a technician, nurse or other person, if such use is directed or *116 ordered by a person licensed or authorized to practice medicine, dentistry, podiatry or osteopathy under the provisions of the Education Law of the State of New York.” (10 NYCRR, § 16.19.)
Then follows a limitation on sales, leases or loans of X-ray or fluoroscopic equipment for use on human beings in implementation of the foregoing.
This regulation superseded a former regulation preventing the use of shoe-fitting fluoroscopes, which was expanded by present regulation 19 to include all other uses except those pertaining to the practice of medicine, dentistry, podiatry or osteopathy. The Sanitary Code is enacted by the New York State Public Health Council, under authority conferred by section 225 of the Public Health Law, which, the Legislature provided, “ shall have the force and effect of law ”. The Public Health Council consists of the State Commissioner of Health and eight members appointed by the Governor, of whom at least four are required to be physicians, and one a sanitary engineer (Public Health Law, § 220). When regulation 19 was added in 1957, the Public Health Council, besides the Commissioner, consisted of six physicians, a sanitary engineer and the president of a university.
The thrust of this regulation is clear. It prohibits the application of ionizing radiation to the human body through the use of fluoroscopes, X ray or otherwise, except by the direction of a doctor of medicine, dentist, podiatrist or osteopath, and for use in those fields. It does not prevent a chiropractor or any other person qualified to take X-ray pictures from doing so, provided that it is to he used in the fields of medicine, dentistry, podiatry or osteopathy if the X ray is ordered for use in his field by a person so licensed or authorized by law to diagnose and treat human ailments. Chiropractors are not authorized by law in New York State to diagnose or treat patients for disease (Matter of Sausser v. Department of Health, 242 N. Y. 66; People v. Kightlinger, 276 App. Div. 230, affd. 301 N. Y. 639; People v. Maybrook, 276 App. Div. 192, affd. 301 N. Y. 637). Before the adoption of regulation 19, under the cases just cited, a chiropractor or anyone else having the technical competence to do so could legally take X rays and explain what they showed, but was prohibited by subdivision 4 of section 6501 of the Education Law
*117 ‘‘ to diagnose, treat, operate or prescribe foi* any human disease) pain, injury, deformity or physical condition ” or to hold himself out as being able to do so. It is not necessary to decide upon this appeal precisely what a chiropractor may or may not do without violating this proscription in the Education Law. Matter of Sausser v. Department of Health (supra) held that a competent X-ray technician was not to be prevented from operating an X-ray laboratory merely because he was not a doctor or because he was a chiropractor. It had nothing to do with limiting the purposes for which X-ray pictures could be taken in the interest of the public health in the light of discoveries in genetics made long afterward. It did not hold that the police power of the State does not extend to reducing the dangers of ionizing radiation by limiting its use to fields in which persons licensed by law to diagnose or treat human ailments are allowed to practice. Chiropractors have sought repeatedly to obtain passage of legislation licensing them to practice chiropractic, but thus far such legislation has failed to be enacted into law. Before such legislation was adopted they were prohibited from practicing altogether by the courts of a number of other States (Board of Med. Examiners v. Freenor, 47 Utah 430; State v. Smith, 233 Mo. 242; State v. Johnson, 84 Kan. 411; Jones v. People, 84 Ill. App. 453; Bragg v. State, 134 Ala. 165; Little v. State, 60 Neb. 749; State v. Gravett, 65 Ohio St. 289). Some of those decisions related to osteopaths before they were licensed, but the principle is the same. There is nothing in regulation 19 which would prohibit a competent X-ray technician who operates an X-ray laboratory from taking X-ray pictures at the instance of persons licensed in this State to diagnose or treat human ailments, merely because he is a chiropractor, nor would a doctor, for example, be prevented from taking or ordering X rays if he deemed it medically advisable in connection with prescribing the kind of massage treatment which it is held that chiropractors can administer legally in this State (People v. Maybrook, supra). Whether or not these things would be likely to happen is beside the point. The Public Health Council has decided after thorough investigation and reflection that the wholesale taking of X rays for use in chiropractic is a public health menace unless under exceptional circumstances, perhaps, a physician decides in the exercise of medical judgment that the benefit anticipated to be *118 derived from the treatment to be administered overcomes the danger of the exposure involved. The training of a doctor of medicine is more extensive than that of a chiropractor. There is no arbitrary classification rendering regulation 19 unconstitutional in limiting exposure to X ray or fluoroscopy to use in the healing arts in which persons can be licensed to diagnose and treat patients. It did not transcend the police power for the Public Health Council to rule that unfamiliarity of chiropractors with the effects of radiation and the danger of their ordering or applying too much radiation through ignorance constituted a danger to the public health, especially in view of the wholesale use of X ray in their domain. The scientific discoveries of the past 17 years have indicated that greater knowledge is required in order to determine when X-ray photographs should be taken than merely to know how to take them, with the consequence that the toxic effect of exposure to radiation has come to be understood as being legally similar to the toxic effect of taking drugs. A pharmacist or druggist may put up a prescription, but may do so only upon order of a physician. This both reduces the quantity of drugs consumed and causes them to be taken only in instances where a practitioner licensed to diagnose and treat human ailments is of the opinion that the disadvantages are likely to be outweighed by the benefits expected to be derived. The adoption of regulation 19 is held to have been within the police power of the State.
It remains to consider whether under the State Constitution the Legislature could delegate the power to the Public Health Council to adopt this regulation as part of the State Sanitary Code. Concerning this the Appellate Division said: “ The regulation was promulgated by the Public Health Council of the State of New York pursuant to section 225 of the Public Health Law, which, by subdivision 3 thereof, authorizes the council, with the approval of the Commissioner of Health, ‘ to establish, and from time to time, amend and repeal sanitary regulations, to be known as the sanitary code of the state of New York ’, which may, according to paragraph (a) of subdivision á of the same section, ‘ deal with any matters affecting the security of life or health or the preservation apd improvement of public health in the state of New York/’?
*119 The State Sanitary Code dates back at least until 1914. It covers in detail what are communicable diseases and provides for the reporting thereof, the isolation of patients, quarantine and the adoption of other measures preventing spread of the disease. It deals with food poisoning, the handling of food forbidden in certain cases, destruction of contaminated foodstuffs, cleansing, renovation or disinfection, the regulation of carriers of disease germs and especially the control of typhoid carriers; it provides for inspection, bacterial counts and physical examination as well as permits for the sale of milk and cream, the administration of tuberculin tests, Bang’s abortion disease and mastitis in cattle, the regulation of pasteurization plants, grades of milk and cream; it prescribes the use of serum for the treatment of pneumonia, meningitis and scarlet fever, regulates human blood donors and plasma, human serum or other derivatives for therapeutic or prophylatic purposes, regulates drinking water suppliers, provides for the disinfection of swimming pools; it contains other substantive provisions guarding against miscellaneous health hazards, such as prohibiting the distribution of tetraethyl lead in concentrated form to the public, forbids the use of nitro-cellulose X-ray film, forbids the sale of poisonous substances for polishing kitchen ware or silverware, forbids spitting in public places, common towels, common drinking cups and eating utensils as well as poisonous insecticides and exterminators and requires warning labels on containers of hazardous substance enumerated, like the rest, in minute detail, regulates barber shops and beauty parlors, prescribes the qualifications of public health personnel, regulates the operation of public water treatment and purification plants as well as public sewage treatment plants, prescribes the qualifications of public health engineers, sanitarians, and sanitary inspectors, regulates unincorporated maternity hospitals, provides for the methods of transportation of dead bodies, the conduct of hotels, boarding houses and restaurants, prescribes detailed measures protecting maternal and child health, farm labor camps, the inspection and distribution of meat, and the possession, sale and distribution of poliomyelitis vaccine: Finally chapter XVI controls ionizing radiation.
This enumeration of the general subject matter of the Sanitary Code illustrates the extent of the functions which have been *120 exercised by the Public Health Council in executing the responsibilities conferred upon it by section 225 of the Public Health Law. The subject matter of some but not all of the chapters of this Sanitary Code is designated in a general way in certain paragraphs of subdivision 4 of section 225. The scope of all of these powers is derived from the language of paragraph (a) of subdivision 4 of section 225, quoted in the opinion at the Appellate Division, to ‘ ‘ deal with any matters affecting the security of life or health or the preservation and improvement of public health in the state of New York, and with any matters as to which the jurisdiction is conferred upon the public health council ”.
One of the most recent decisions involving the delegation of power to boards and commissions is Matter of City of Utica v. Water Pollution Control Bd. (5 N Y 2d 164). Although standards or guides must be prescribed where legislative power is delegated, it need be done, under the case cited, in only so detailed a fashion as is reasonably practicable in the light of the complexities of the particular area to be regulated. Necessity therefore fixes a point beyond which it is unreasonable and impracticable to compel the Legislature to prescribe detailed rules. Although an enactment entitled a health law or regulation must be such in fact as well as in name, and must not attempt in the name of the police power to effect a purpose having no adequate connection with the common good (Loblaw, Inc., v. New York State Bd. of Pharmacy, 11 N Y 2d 102; Matter of Viemeister v. White, supra), the Sanitary Code in general presents a situation where flexibility and the adaptation of the legislative policy to infinitely variable conditions constitute the essence of the program (Matter of City of Utica v. Water Pollution Control Bd., supra; Lichter v. United States, 334 U. S. 742, 785). We think that it lay within the technical competence of the Public Health Council to determine where the principal sources of ionizing radiation are, especially as applied to the reproductive organs, and to adopt measures to limit such exposure where, in the jiidgment of the council, it is excessive in the sense that the extent of the exposure exceeds the benefits derived. The principle is established that a general grant of power, in such instances, may be made to an expert board or commission, leaving its implementation to the members who are chosen from experts *121 in the field (Opp Cotton Mills v. Administrator, 312 U. S. 126, 145; United States v. Rock Royal Co-op., 307 U. S. 533, 574; People ex rel. Doscher v. Sisson, 222 N. Y. 387, 397; Matter of Smith v. Morgan, 278 N. Y. 667).
The cases cited in behalf of appellants and of the amicus curia are not controlling. A number of them have been dealt with above. People v. Love (298 Ill. 304), decided in 1921, upon which much reliance has been placed, merely held a statute to be arbitrary and unreasonable which required chiropractors to take a four-year course of study while doctors of medicine were subject to no such requirement, and to require an applicant for a license to practice chiropractic (in a State where chiropractors are licensed by the Legislature) to have his moral and professional character established by two medical men or osteopaths. This was held to be arbitrary inasmuch as there are other ways of establishing character and qualifications.
We do not consider that regulation 19 contains an absolute prohibition, as our dissenting brethren aver, that no chiropractor shall ever be permitted to take X rays. Although the language of the regulation says that at the beginning, this statement is qualified by the subsequent proviso that this “ regulation shall not prohibit the use of radiation by a technician, nurse or other person, if such use is directed or ordered by a person licensed or authorized to practice medicine, dentistry, podiatry or osteopathy under the provisions of the Education Law of the State of New York.” That is equivalent, as previously stated, to permitting a druggist or pharmacist to prepare a prescription which has been issued by a doctor. Under regulation 19 a person is not prevented from operating an X-ray laboratory merely because he is a chiropractor, provided that he is a competent technician and takes X rays only by the direction of those who are licensed to diagnose and treat disease for use in their respective fields. The testimony of the Commissioner and Deputy Commissioner of Health that under this regulation chiropractors would not be permitted to take X rays merely meant, as the context shows, that they are not permitted to take them upon their own responsibility. In moving for judgment at the close of the evidence, the trial counsel for plaintiffs conceded that by its express provisions regulation 19 “ authorizes anyone in this wide world to take an X-ray picture ”, but contended that it was *122 arbitrary and discriminatory to permit Mm to do so only on an order from a physician, dentist, podiatrist or osteopath. The latter contention we have held to be unsound.
The judgment appealed from should be affirmed, with costs.