OPINION OF THE COURT
Michael R. Juviler, J.
This is a decision after a hearing to determine the defendant’s mental competency to stand trial. The defendant has been indicted for sale of cocaine as an A-I felony, and possession of cocaine.
This case raises questions regarding the meaning and constitutionality of the definition of “[qualified psychiatrist” in CPL 730.10 (5). The CPL provides for the examination of a defendant by “two qualified psychiatrists” to determine his ability to understand the proceedings and assist in his defense. (CPL 730.20 [1].) The same definition appears in the Insanity Defense Reform Act of 1980 (L 1980, ch 542), which requires examination by “two qualified psychiatrists” of a defendant who is found not responsible by reason of mental illness, to determine his present mental illness and dangerousness. (See, CPL 330.20 [1] [q]; 330.20 [2].) The issues in this case affect all psychiatrists *1073 who perform these important examinations throughout New York State, in hundreds of criminal actions each year. Yet there is no published decision on these questions, so the court must address them without the help of precedent.
I make the following findings, based upon the testimony of Dr. Adolph Goldman and Dr. Franklin S. Klaf; their reports of examinations of the defendant in 1977 and on October 18, 1984; medical records of Long Island College Hospital submitted by the defendant; the brochure Information For Applicants, published by the American Board of Psychiatry and Neurology; the American Osteopathic Association Yearbook and Directory of Osteopathic Physicians; and the two doctors’ affidavits regarding their education and training.
I. THE MEANING OF “QUALIFIED PSYCHIATRIST”
Defendant contends that this court may not consider the testimony or reports of Drs. Goldman and Klaf, because neither is a “[qualified psychiatrist” as that term is defined in GPL 730.10 (5). These doctors were appointed by the director of Kings County Hospital to examine the defendant and determine whether he is an incapacitated person. GPL 730.20 (1) requires that the examination be conducted by “two qualified psychiatrists” (People v Ross, 50 AD2d 1064 [4th Dept 1975]). The People correctly concede that the People bear the burden of establishing that Drs. Goldman and Klaf are “qualified psychiatrists.” (Supra.)
GPL 730.10 (5) defines “[qualified psychiatrist” as a “physician” who:
“(a) is a diplómate of the American board of psychiatry and neurology or is eligible to be certified by that board; or
“(b) is certified by the American osteopathic board of neurology and psychiatry or is eligible to be certified by that board” (emphasis added).
Dr. Goldman and Dr. Klaf have not been certified by the American Board of Psychiatry and Neurology or the American Osteopathic Board of Neurology and Psychiatry. Therefore, the court must determine whether they are “eligible to be certified” by either Board.
The American Osteopathic Board of Neurology and Psychiatry establishes the educational and professional background required for an applicant’s certification; the applicant must also pass an examination. (American Osteopathic Association Yearbook and Directory, at 579 [1984].) One of the requirements before examination is graduation from a college of osteopathic *1074 medicine. Neither psychiatrist in this case meets that requirement; therefore, neither is “eligible to be certified by” that Board. As a result, the People must establish that the doctors are “eligible to be certified by” the American Board of Psychiatry and Neurology.
The American Board of Psychiatry and Neurology is a private corporation which, as stated in its publication Information For Applicants, evaluates the competence of specialists in psychiatry and neurology, conducts examinations of candidates for certification by the Board, and grants certificates of special competency to successful applicants. To be allowed to take the examination, the physician must have an unlimited license to practice medicine in a State; both doctors in this case are so licensed in New York State. In addition, the candidate must complete four years of approved postgraduate training, including at least three years of residency in psychiatry or neurology (Information For Applicants, at 6). The two doctors have convincingly set forth their approved training, in testimony and affidavits, and the defendant does not dispute their fulfillment of this requirement.*
The defendant, however, interprets the statutory requirement of eligibility to impose an obligation on the physician actively to seek certification by the Board. This interpretation finds support in the Board’s policy that the Board “does not recognize or use the term ‘Board Eligible’ and does not issue statements concerning ‘Board Eligibility.’ The Board informs an applicant of admissibility to examination only when the applicant has an active, approved application on file in the Board’s office” (Information For Applicants, at 5).
*1075 Defendant contends that Dr. Goldman is not eligible to be certified, because he failed the Board’s examination and testified that he will not apply to take it again. Similarly, Dr. Klaf’s testimony that he does not know whether he will apply for certification means, in the defendant’s view, that Dr. Klaf is not eligible to be certified by the Board. The People maintain that a physician who has the professional background required by the Board of an applicant is “eligible” to be certified within the meaning of the statute, even if the physician has no application pending before the Board.
The dispute between the parties reflects the paradox that the statute defines “qualified psychiatrist” in terms of eligibility to be certified as a specialist by the Board, but the Board disavows the status of eligibility. The resolution of the paradox lies in recognizing the court’s role in this litigation. Its role is to interpret, in the first instance, the intent of the Legislature, not the Board’s policy. The statute provides that some persons who have not been certified by the Board are nevertheless to be considered “eligible” to be certified. Regardless of the Board’s rejection of the concept of eligibility, perhaps because it devalues the Board’s program of certification, the Legislature has found that concept useful for determining who, in its view, is qualified to examine defendants in New York State.
The question remains, what precisely did the Legislature mean by the term “eligible”? The term could mean: (a) eligible to take the Board’s examination for certification, in the sense of possessing a physician’s license and completing four years of residency; (b) having taken and officially passed the examination and awaiting the formal certification; (c) having taken the examination and awaiting the results; or (d) having applied to take the examination. The two doctors in this case meet only the first definition. That is probably true of most psychiatrists who have been appointed to examine defendants under the CPL.
The legislative history of the present version of CPL 730.10 (5) shows that the first meaning is the one intended by the Legislature: the Legislature has sought to ensure that defendants whose competency is in doubt (or whose mental condition must be determined after acquittal by reason of insanity) are examined by psychiatrists who have suitable specialized training to do so, even if they are not diplomates of the Board, and regardless of their experience with the Board’s examination. The Legislature reasonably determined that passing the rigorous examination was an unnecessarily high standard for the State’s purpose, but that the Board’s requirement of specialized training was appropriate to the State’s program.
*1076 Before the enactment of the Criminal Procedure Law, Code Criminal Procedure § 659 governed examinations as to competency. It provided for examinations by “two qualified psychiatrists as defined in the mental hygiene law”. Mental Hygiene Law (former) § 27, enacted in 1936, established a State Board of Psychiatric Examiners, which was empowered to certify as “qualified psychiatrists” licensed physicians who had at least five years’ experience in actual practice, and had either two years of full-time practice in treating persons suffering from mental disease, five years of practice substantially confined to treating such patients, or three years of experience in a State Board approved psychiatric clinic; an applicant also was expected to fulfill any additional requirements established by the State Board. Thus, before enactment of the CPL, eligibility to examine a defendant meant having a certain background in psychiatry leading to an actual certification by the State; no special examination was required.
This policy was continued when the Criminal Procedure Law was enacted in 1971. CPL 730.10 (5) replaced Code Criminal Procedure § 659 and defined a “qualified psychiatrist” as “a physician who is certified as a qualified psychiatrist under section [13.25] of the mental hygiene law.” Mental Hygiene Law § 13.25, which replaced Mental Hygiene Law § 27,"established a different certification procedure for qualified psychiatrists. The State Commissioner of Mental Hygiene was authorized to issue certificates to physicians who were diplomates of or “eligible” to be certified by the American Board of Psychiatry and Neurology or the American Osteopathic Board of Neurology and Psychiatry, or had “equivalent” education, training, and experience meeting standards established by the Commissioner. Again, the legislative intent was to require a certain background in psychiatry for persons submitting opinions to the court about a defendant’s competency, but not to require a special examination. The process of certification, however, was shifted from a public board to the Commissioner of Mental Hygiene. The two private psychiatric Boards were introduced into the process, as the source of standards relating to the candidate’s professional training.
Within five years, the process of certification by the Commissioner proved burdensome and wasteful. In 1976, at the request of the Department of Mental Hygiene, certification of “qualified psychiatrists” by a State official was eliminated; only the concept of eligibility to be certified by one of the two private professional Boards remained. In the absence of a public officer’s passing on applications for certification by the State, determina *1077 tian of the status “qualified, psychiatrist” was left to the directors of hospitals in assigning psychiatrists for examination of defendants, and to the courts. This was accomplished by repealing Mental Hygiene Law § 13.25 and substituting the present CPL 730.10 (5).
The legislative memorandum in support of the bill making this change states that the bill saves the cost of certification by the State. Many physicians who satisfied the requirements had applied for certification although they had no intention of conducting CPL article 730 examinations. The bill terminated the practice of physicians’ obtaining a State certificate merely “for the purpose of framing it and hanging it in their waiting rooms” (Legislative memorandum, 1976 McKinney’s Session Laws of NY, at 2330). The memorandum suggests that physicians who wish to perform examinations pursuant to article 730 can “file with the courts evidence that they meet the qualifications.” (Ibid.)
While abolishing the administrative step of certification, the new statute imposes even more objective criteria of qualifications than its predecessor did, for it no longer permits an examining psychiatrist to meet requirements that are “equivalent” to those of one of the psychiatric Boards. Now the physician actually must have the specialized training required by the American Board of Psychiatry and Neurology or its osteopathic counterpart.
This legislative history demonstrates that the Legislature’s intent continuously has been to require adequate specialized training of the examining physicians, not to require the physician to pass, apply for, or intend to take a particular private examination. In the Legislature’s view, a physician who meets the psychiatric Board’s requirements of specialized training is no less capable of inquiring into a defendant’s competency than a physician who also has pending before the Board an application to take the examination.
Where taking an examination governs eligibility to perform professional services, the Legislature has expressly provided for that. For example, Judiciary Law § 478 sets forth limited instances in which a person may appear in court as a lawyer before admission to the Bar. It permits a law school graduate who has taken the first Bar examination and is waiting for the results, or who failed the first Bar examination and is awaiting the results of the second, to appear in court for a Legal Aid organization or a public agency. The legislative purpose was to relieve the burdens on District Attorneys’ offices, Legal Aid Societies, and *1078 similar law offices performing a public function, by permitting their new employees who had taken the Bar examination to practice as lawyers under supervision, under limited exceptions to the statutory requirement of admission to the Bar. In the present case, the purpose is not to permit temporarily unlicensed doctors to practice medicine or fledgling psychiatrists to assist the courts until they are admitted to practice psychiatry; a physician may practice psychiatry in New York State without any certification or license (Education Law arts 131, 153). The purpose is to select from among physicians those who are qualified by experience to assist the courts in a specific area. That purpose has been met without an examination.
This court accords great weight to the interpretation given CPL 730.10 (5) by the director of Kings County Hospital, who is authorized by CPL article 730 to designate two qualified psychiatrists to examine defendants (CPL 730.20). He has designated Drs. Goldman and Klaf for many years, and has found in thousands of cases that they are eligible to be certified by the Board and qualified to examine defendants. Although the courts must make the final determination, “[W]here the interpretation of a statute or its application involves a special knowledge, courts' regularly defer to administrative expertise”. (Matter of Burger King v State Tax Commn., 51 NY2d 614, 621 [1980].)
I therefore conclude that the People hsive satisfied their burden of proving that Dr. Goldman and Dr. Klaf are “[qualified psychiatrists”, as that term is defined in CPL 730.10 (5): each has the requisite license to practice medicine and meets the requirements of specialized training of the American Board of Psychiatry and Neurology.
ii. defendant’s claims of unlawful
DELEGATION AND VAGUENESS
Defendant also contends that the statute, as interpreted, unconstitutionally delegates a legislative power to a private body, by allegedly leaving to the psychiatric Board the determination of qualifications of examining psychiatrists.
A strong presumption of constitutionality applies to legislative enactments (Lighthouse Shores v Town of lslip, 41 NY2d 7 [1976]). This presumption can be upset only by proof persuasive beyond a reasonable doubt (Hotel Dorset Co. v Trust for Cultural Resources, 46 NY2d 358 [1978]). “[0]nly as a last resort should courts strike down legislation on the ground of unconstitutionality” (Lighthouse Shores v Town of Islip, supra, at p 11; see, Birkeland v State of New York, 98 AD2d 395 [2d Dept 1984]). *1079 “Particularly, courts of first instance should not exercise transcendent power of declaring an act of the Legislature unconstitutional except in rare cases where life and liberty is involved and invalidity of the act is apparent on its face” (National Psychological Assn. v University of State of N. Y., 18 Misc 2d 722, 725-726, affd 10 AD2d 688, affd 8 NY2d 197 [I960]). This rule avoids, where possible, the uncertainty and confusion which may follow a trial judge’s finding of unconstitutionality.
With these guidelines, I now consider the challenge to constitutionality. In support of his position, defendant relies upon Matter of Fink v Cole (302 NY 216 [1951]). In that case, the Legislature delegated the power to license owners, trainers, and jockeys of thoroughbreds to the Jockey Club, a private corporation, at its discretion. The Court of Appeals held that the Legislature’s delegation of its licensing power to a private corporation was an unconstitutional relinquishment of legislative power, and that even such a delegation to a governmental agency would be “striken down for lack of guides and proper standards” (Matter of Fink v Cole, supra, at p 225; see also, Novak v Town of Poughkeepsie, 57 Misc 2d 927 [Sup Ct, Dutchess County 1968]; Farias v City of New York, 101 Misc 2d 598 [Sup Ct, NY County 1979]).
CPL 730.10 (5) differs significantly from the delegation of the sovereign’s licensing powers held unconstitutional in Matter of Fink (supra), and these other cases. CPL 730.10 (5) is not a licensing statute, and does not delegate to a private board the sovereign’s power to license physicians. The licensing of physicians is administered by the State (Education Law § 6524), and there is no licensing of psychiatrists.
The purpose of CPL 730.10 (5) is not to license psychiatrists, but to ensure that psychiatric examinations of criminal defendants are conducted by physicians who are determined by designated public officials, the “directors” of public hospitals (CPL 730.10 [4]; 730.20 [1]), to be qualified psychiatrists, based upon objective, verifiable criteria. The American Board of Psychiatry and Neurology provides, for its own purposes, explicit standards of specialized training. These are also useful for a reasonable determination by a public “director”, reviewable by the courts, as to the minimum competence of a physician to give a psychiatric opinion about a defendant’s capacity to understand the proceedings and assist in his defense, or his mental condition after acquittal by reason of insanity. As this is not a licensing scheme, restrictions on delegation of legislative authority do not apply. (Morgan v New York Racing Assn., 72 AD2d 740 [2d Dept 1979].) In any event, as Chief Justice Marshall noted, “Congress *1080 may certainly delegate to others, powers which the legislature may rightfully exercise itself.” (Wayman v Southard, 10 Wheat [23 US] 1, 43, quoted in Stanton v Board of Supervisors, 191 NY 428, 432.)
The Legislature could have prescribed a different standard of professional training, or, on the other hand, could have provided merely that the examining physician have “suitable” experience in psychiatry. Instead, it restricted the directors and the courts to using physicians who have precisely the extensive background required by an esteemed professional organization for recognition by that group. In the judgment of the Legislature and the agencies which administer article 730 examinations, this standard has worked well since its adoption in the statutes in 1971, as evidenced by its readoption in 1976 and 1980. During the 13 years in which the Board’s standards of training have been incorporated into the statutory definition of “qualified psychiatrist”, there has been no claim that the Board’s standards have been calculated or applied to benefit a private group or to prejudice defendants. No such claim is made here. On the contrary, in recognizing the Board’s stringent standards of experience for specialization in psychiatry, and adopting them as a minimum qualification for eligibility to examine defendants, the Legislature has done a service to defendants, the public and the courts.
In Morgan v New York Racing Assn. (supra), the Appellate Division distinguished Matter of Fink (supra) in a manner that applies to the case at bar. In Morgan, the petitioner, owner of a racehorse, claimed an unconstitutional delegation of authority in requiring registration of a horse’s name, age, and pedigree with the Jockey Club before it could race in New York State. The court distinguished Matter of Fink because it involved the delegation of the State licensing power to a private corporation to administer solely within its discretion. In Morgan, the Jockey Club registered thoroughbred pedigrees for use of its members independently of the legislative scheme, and the Legislature had “seen fit to rely on those registrations as an accurate source of information.” (Supra, at p 741.) Similarly, in the case at bar, the Boards referred to in CPL 730.10 (5) are not licensing psychiatrists; they are not organized to carry out any function for the State; and the Legislature has “seen fit” to rely on them as a source of standards of professional training.
In Chiropractic Assn. v Hilleboe (12 NY2d 109 [1962]), the Legislature had delegated to an administrative agency the power to determine who could X-ray the spine. The Court of *1081 Appeals, in upholding the constitutionality of the delegation, stated that although standards must be provided when legislative power is delegated, they need only be as detailed as is reasonable in light of the particular area to be regulated. (Supra, at p 120.) The court noted that where the adoption of particular measures lies within the technical competence of an administrative agency, “a general grant of power, in such instances, may be made to an expert board or commission” (supra, p 120). In the present case, the directors of public hospitals, and the courts, administer article 730 and determine who may examine defendants, and this administration takes place within guidelines far more precise than those set forth by the statute in the Chiropractic Assn. case. (See, 12 NY2d, at p 118.)
Consistent with this judicial treatment of delegation is the sound legislative and administrative practice in this State, in the field of professional education and training, of relying on distinguished private professional organizations to determine the adequacy of specific programs of training, and to administer licensing examinations. For example, in medicine, the State has substantially left the approval of programs of medical education to private “accrediting organization^] acceptable to” the Department of Education. (8 NYCRR 60.1 [a] [2], [3], [4]; see, Education Law § 6524 [2].) Graduates of nonaccredited programs may be licensed to practice medicine, if they have completed three years of postgraduate training “approved by the Accreditation Council on Graduate Medical Education or the American Osteopathic Association”. (8 NYCRR 60.3 [b] [2].) Graduates of medical schools may fulfill the requirement of an examination for licensing by passing all parts of “the examination of the National Board of Medical Examiners, Inc.,” (8 NYCRR 60.4 [a] [2]) “the examination of the National Board of Examiners for Osteopathic Physicians and Surgeons”, or other examination by a specified private organization. (8 NYCRR 60.4 [a] [3].) Similarly, the Rules of the Court of Appeals for the Admission of Attorneys and Counselors-at-Law “delegate” approval of law schools to the American Bar Association and the Association of American Law Schools. (Rules of Court of Appeals 22 NYCRR 520.3 [b].)
Thus, assessment of professional training is an area commonly left to established professional organizations more knowledgeable in that specialized field than the Legislature or administrative agencies. Against this background, the “delegation” challenged in this case is minute, well rooted in the traditions of the State, and reasonable.
*1082 Defendant also challenges the statute on grounds of vagueness, but CPL 730.10 (5) is not void for vagueness. The vagueness doctrine commonly applies to criminal statutes, administrative regulations that carry penal sanctions, and statutes or administrative regulations imposing serious civil sanctions, particularly where 1st Amendment rights are endangered (Quintard Assoc. v New York State Liq. Auth., 57 AD2d 462, 465 [4th Dept 1977]; see also, Giaccio v Pennsylvania, 382 US 399 [1966]). None of these situations obtains here. Moreover, the statute is sufficiently clear.
III. THE DEFENDANT’S COMPETENCY TO STAND TRIAL
Having determined that Drs. Goldman and Klaf are both “qualified psychiatrists” and that CPL 730.10 (5) is constitutional, the court must now determine whether the People have proven by a fair preponderance of the evidence that defendant is competent to stand trial (People v Santos, 43 AD2d 73 [2d Dept 1973]). The standard to be applied in determining defendant’s competency is whether he “‘has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding — and whether he has a rational as well as factual understanding of the proceedings against him.’ ” (Dusky v United States, 362 US 402 [I960]; People v Picozzi, 106 AD2d 413 [2d Dept 1984].) The evidence shows that he does.
The defendant has a history of alcohol abuse and cocaine abuse. About 10 years ago, defendant was hospitalized as a result of a blow to the head. Defendant also stated that he hears whispering in his cell, and that on occasion his bed shakes. In 1977, defendant had a history of epileps3. Defendant informed the doctors in 1984 that the charge of possession of cocaine arose from his overdose of cocaine at a McDonald’s Restaurant in December of 1983.
These facts, along with other matters alluded to by defendant at the examination, are consistent with mental illness. But in the context of all the facts they do not diminish his competency. Drs. Klaf and Goldman examined defendant in 1977 before his trial on a robbery charge, and again in this action in 1984. After each examination, the doctors concluded that defendant was not psychotic and was fit to proceed.
The doctors did not recall examining defendant in 1977; in light of the thousands of examinations conducted by the doctors over the ensuing seven-year period, this is understandable. When given the opportunity to review their earlier reports, both witnesses stuck to their findings of competency. Drs. Klaf and Goldman proved that they were willing to change their opinions *1083 when the circumstances warranted, and despite this, they remained convinced that this defendant was fit to proceed. My review of the 1977 report confirms their findings. I also agree with their conclusion that his condition has improved since 1977.
I am not bound to accept their opinions, but I find that their opinions are confirmed by the other facts. The defendant cogently narrated the events surrounding his arrests in the present case. During the recent examination, he rationally articulated several defenses to the crimes charged. Defendant demonstrated familiarity with the criminal justice system and the roles of the judge and the lawyers. The crime of sale of cocaine with which defendant is charged does not suggest an inability to understand the proceedings. This court found him fit to proceed in 1977, and nothing that happened in that case thereafter has cast doubt on the earlier findings of competency.
Accordingly, I find that defendant is able to understand the proceedings against him and to assist in his defense.

 Dr. Adolph Goldman is a graduate of the Medical School of the University of Geneva, Switzerland, and served as an intern at Queens Hospital Center from 1958 to 1961. He completed a three-year psychiatric residency at the Bronx Veterans Administration Hospital. He served two years as psychiatrist at Rockland State Hospital, approximately two years as a supervising psychiatrist for the New York State Department of Mental Hygiene, and five years as a school psychiatrist for the New York City Board of Education. In 1968, Dr. Goldman joined the Criminal Court Forensic Psychiatry Clinic in Manhattan and since 1971 has been employed by the Kings County Hospital in the Forensic Psychiatry Service. He was permitted to take the Board’s examination in 1970. Although he failed, the Board’s rules permit him to apply for another examination.
Dr. Franklin S. Klaf was graduated from the New York University College of Medicine in 1955. He completed a general internship at Montefiore Hospital in 1956, and a three-year psychiatric residency at Bellevue Hospital, Kings-bridge Veterans Administration Hospital, and the Public Health Service Hospital. Dr. Klaf is a Diplómate in Psychological Medicine of the British Psychiatric Association. He has practiced psychiatry for 24 years.