OPINION OF THE COURT
Marylin G. Diamond, J.
Plaintiffs seek to continue the temporary closing order previously granted against the Capri Theater (the Theater) pending trial for a permanent injunction, which would close the Theater for one year, on the ground that the Theater is violating 10 NYCRR subpart 24-2, and Administrative Code of the City of New York § 7-703 (e) and (l). As against defendant Alfred Moody, Jr. (Moody), owner of the building, plaintiffs seek a preliminary injunction enjoining him from using the premises during the pendency of this action.
Plaintiffs commenced this action in its ongoing efforts to control the spread of the HIV virus, identified as the cause of Acquired Immune Deficiency Syndrome (AIDS). The Theater has been in existence in the Times Square area for approximately 27 years, initially exhibiting Greek films, and later switching to an art format. Unable to obtain first run movies, the Theater began exhibiting sexually explicit heterosexual, triple x-rated films. With a seating capacity of approximately 230 seats, the Theater averaged approximately 1,200 patrons a week. The admission price ranges between $5 and $6. The Theater operated during the hours from 9:00 a.m. until 6:00 a.m. the next day. Defendants emphasize that no movies portraying homosexual sexual conduct are shown in the Theater.
On March 3, 1995, Dr. Benjamin A. Mojica, the Acting Commissioner of the New York City Health Department (NYC Health Department), wrote to the Theater owners stating, in relevant part:
"You are hereby notified that this Department has reason to believe that your establishment has facilitated the occurrence of legally prohibited sexual activities on the premises. Specifically, acts of fellatio have been observed in various parts of your establishment. You are further notified that inspections of your facility are being conducted on a continuing basis.
"Nothing short of the immediate cessation of the prohibited sexual activities in your theater is acceptable. Unless you elim *21 inate such activities at once, we will seek a court order closing your premises.”
The parties stipulated that the March 3 letter was not sent to Moody, the owner of the building. Defendant Gioulos, a corporate officer, and the Theater’s manager, testified that after receiving the letter he consulted a lawyer the very next day. On March 4, his lawyer wrote to the NYC Health Department, and stated that the Theater "has always and will continue to abide by section 24-2.2 of the New York State Sanitary Code”. The March 4 letter also stated that operating procedures have been established to prevent the "type of dangerous behavior” prohibited under section 24-2.2. As a result of his meeting with his lawyer, Gioulos testified that he intensified his efforts to stop the prohibited sexual activities from occurring on the premises. There was no further correspondence or other communications between any of the parties.
On Tuesday, August 29, 1995, approximately six months after the March 3 letter, a task force of police and NYC Health Department officials armed with the TRO arrived at the Theater and temporarily closed it pending hearing of the instant motion on the ground that prohibited sexual activities continued to occur on the premises after the March 3 warning letter. At the hearing, seven NYC Health Department inspectors testified that they observed numerous acts of fellatio in the period starting just prior to the March 3 letter and ending August 28, 1995, the day before closure. The inspectors testified that they observed sexual acts in all areas-of the Theater, including the main seating area, the balcony and the bathroom. In total, the inspectors observed 150 incidents of prohibited sexual activity, mostly involving acts of fellatio, in which 290 individuals participated. The inspectors also testified that on many visits they did not see anyone who they could identify as a monitor. Even when a monitor was observed, they testified that they never witnessed a monitor ejecting a patron from the Theater for engaging in prohibited sexual activity. In addition, inspectors testified that such individuals believed to be monitors were ineffective in preventing acts of fellatio because instances of such activity occurred openly for long periods of time without any enforcement. Their testimony clearly demonstrated that while other prohibited sexual acts occurred, fellatio was the prevalent sexual activity, and that it was open and notorious in the Theater. The inspectors also testified that patrons cruised the aisles looking for partners, and that on *22 many occasions they were propositioned by these patrons. Several inspectors testified that they observed approximately one third to one half of the patrons exposing themselves at any given time. They further testified that locating sexual activity could be accomplished by simply watching patrons moving closer to a particular area in the Theater in order to view ongoing sexual activity between other-patrons. There was also testimony that the Theater was filthy, that many patrons were either sleeping or consuming alcohol, and that on some occasions drug use was observed. The credible testimony of the inspectors establishes that the exhibition of films at the Theater was only incidental to the other activity taking place there.
Defendants raise numerous constitutional and interpretative challenges to the statutes and regulations implicated herein. Only one of the challenges merits consideration. Defendants argue that 10 NYCRR subpart 24-2 is an unconstitutional exercise of the State’s police powers. The State’s police power may be invoked when the action is reasonable both with respect to what is sought to be accomplished and the means used to effect such ends (see, Matter of Charles v Diamond, 41 NY2d 318, 324 [1977]). The Legislature is vested with broad discretion to determine what is in the public interest and by what measures and what means are reasonably necessary for the protection of those interests (City of New York v Castro, 143 Misc 2d 766, 769 [Sup Ct, NY County 1989], affd 160 AD2d 651 [1st Dept 1990]). Axiomatically, legislation reasonably designed to promote the general welfare of society is not ipso facto unconstitutional simply because it incidentally affects an individual’s rights (Montgomery v Daniels, 38 NY2d 41, 54 [1975]; People v Bunis, 9 NY2d 1, 4 [1961]). Such a burden is permissible provided there is a rational connection between the means employed and a legitimate governmental objective (supra).
Dr. Mojica testified that approximately 120 people die of AIDS on a weekly basis in New York City alone, that there are now approximately 1,000 new cases of AIDS reported in New York City every month, and that the disease is the leading cause of death among adults aged 25 to 44 in New York City. Dr. Mojica also testified that 60% of the HIV infection was transmitted through intravenous drug use, 5% through transfusion, and 1% through births. The remaining 34% is sexually transmitted. In 1985, the New York State Public Health Council (the Council) determined that two of the major *23 risk behaviors associated with the sexual transmission of HIV infection amongst multiple, anonymous partners are anal intercourse and fellatio. The Council also determined that establishments making facilities available for the purpose of engaging in such multiple, anonymous sexual activities contributed to the spread of HIV /AIDS. Based on these findings, the Council promulgated 10 NYCRR subpart 24-2 to deal with the risks of multiple, anonymous sexual acts occurring in certain public establishments. Under 10 NYCRR 24-2.2 and 24-2.3, any establishment providing facilities for anal intercourse and fellatio is deemed to be a public nuisance and is subject to closure. In June 1994, the Council amended section 24-2.2 by expanding section 24-2.2 to include vaginal intercourse as another high risk sexual activity amongst multiple, anonymous sexual partners.
Defendants challenge the Council’s findings that fellatio is a high risk sexual activity associated with the transmission of the HIV infection. They argue that sufficient medical evidence demonstrates that fellatio is a low risk activity, and, therefore, should not be listed as prohibited sexual activity. In support of this claim, defendants called as their expert Dr. Robert L. Cohen.
When a regulation or a statute is adopted by those responsible for public health, the regulation or statute must, unless irrational, be upheld by the courts (Grossman v Baumgartner, 17 NY2d 345, 350 [1966]; Chiropractic Assn. v Hilleboe, 12 NY2d 109, 113-114 [1962]). In order to invalidate a statute or regulation on the basis that it lacks support in fact, as here, defendants must show that the facts relied on are not only erroneous, but the issue is not even "truly debatable” (New York State Club Assn. v City of New York, 487 US 1, 18 [1988]).
Defendants have failed to satisfy their burden. Dr. Cohen’s testimony was not unequivocal with respect to whether fellatio was high or low risk in transmitting HIV infection in instances involving multiple, anonymous partners. Since the Council has determined that an establishment which makes facilities available for fellatio is a threat to the public health, this court cannot interfere with such determination (see, Matter of New York State Inspection, Sec. & Law Enforcement Empls. v Cuomo, 64 NY2d 233, 240 [1984]). Surely if the State’s police power is sustainable when used to zone adult oriented establishments to prevent the deterioration of neighborhoods (Matter of Town of Islip v Caviglia, 73 NY2d 544 [1989]), the exercise of such power must be upheld when its goal is to *24 prevent the spread of a disease that is the leading cause of death among adults aged 25 to 44 in New York City.
The determination that the police power is properly invoked does not end the inquiry (Matter of Town oflslip v Caviglia, supra, 73 NY2d, at 558). Where a statute or regulation is directed towards closing an establishment, such as a theater, as here, another level of inquiry must be considered, namely whether such a closing violates this State’s constitutional guarantee of freedom of expression (see, People ex rel. Arcara v Cloud Books, 68 NY2d 553 [1986] [Arcara]). The pivotal issue raised herein is whether plaintiffs’ motion seeking to continue the temporary closure of the Theater is a course of action "broader than needed to achieve its purpose” (supra, at 558) and violates this State’s constitutional guarantee of free expression. As a threshold matter, it is imperative to point out the stark factual differences between Arcara and this case. In Arcara, unlike here, the Court of Appeals was not confronted with a life and death issue — preventing the spread of HIV / AIDS. In Arcara, the defendant operated a store where it sold adult books and showed sexually explicit movies. As opposed to the extensive testimony herein concerning the presence of proscribed activity, in Arcara, based only on the affidavit of an undercover Deputy Sheriff, in which the officer stated he witnessed various lewd and illegal acts, the prosecutor without any notice to the bookstore’s operator commenced an action against the bookstore seeking to close it for a year pursuant to Public Health Law (People ex rel. Arcara v Cloud Books, 65 NY2d 324, 326 [1985], revd 478 US 697 [1986]). In dismissing the claim seeking to close the bookstore, the Arcara Court reasoned that such closure "cannot be said to have such a slight and indirect impact on free expression as to have no significance constitutionally” (People ex rel. Arcara v Cloud Books, supra, 68 NY2d, at 559). The Court held that "when government regulation designed to carry out a legitimate and important State objective would incidentally burden free expression, the government’s action cannot be sustained unless the State can prove that it is no broader than needed to achieve its purpose” (supra, at 558). "If other sanctions, such as arresting the offenders, or injunctive relief prove unavailing, then [the State’s] burden would be met” (supra, at 559). Such other means of policing the illegal conduct short of closure must be obvious and must be undertaken unless there is evidence to show the means are inadequate (Matter of Town oflslip v Caviglia, supra, 73 NY2d, at 558-559).
*25 Here, less drastic means were undertaken, but proved to be unavailing. Defendant Gioulos testified that as early as July 1, 1992 the Theater had in place a policy of prohibiting any sexual activity from taking place on its premises. He advised the Theater’s six employees of this policy, and instructed them to enforce the policy by expelling violators. The March 3 letter placed the Theater owners on direct notice that its enforcement of its policy was ineffective, and that inspections would take place on a continuing basis. The March 3 letter in no uncertain terms warned the Theater owners that nothing short of "immediate” cessation of acts of fellatio was acceptable, and unless such activities are eliminated "at once” the Theater would be closed. Plaintiffs provided defendants with a six-month opportunity to eliminate the sexual activity, including a three-month grace period before they resumed inspections to see whether the March 3 letter had any remedial effect.
Defendant Gioulos testified that after consulting with his lawyer he immediately intensified his efforts to enforce the existing policy by posting signs throughout the Theater containing the actual text of 10 NYCRR 24-2.2 and warning patrons that anyone engaging in prohibited sexual conduct would be removed. Gioulos also testified that the Theater showed a trailer to the audience before each show notifying them of the law and about AIDS prevention. A log book was also kept to document any significant activities in the Theater. Although Gioulos admitted that keeping the log book was soon abandoned, he testified that he would always be in touch with the Theater’s employees mainly to see if there was a problem with patrons engaging in prohibited sexual activity. Gioulos also testified that he purchased jackets for the Theater’s two monitors with the word "security” in large letters emblazoned on the jackets. He testified that there were always at least two employees monitoring the premises, and that in August 1995, based on an employee’s account that a new aggressive type of customer was frequenting the Theater, he hired a third monitor to patrol the premises. Despite the purported intensified measures, between June 6, 1995 and August 28, 1995, inspectors observed a total of 150 incidents, mostly acts of fellatio, involving 290 individuals. The overwhelming and totally credible testimony of such rampant sexual activity, and the absence of any notation in the log book created to record significant activities, simply undermine the testimony of one of the Theater’s monitors, that between receipt of the March 3 letter and Theater’s closure at the end of August he regularly evicted *26 two to three people a week for engaging in sexual activity. That testimony, if believed, clearly demonstrates either that the intensified efforts were purely cosmetic, or that monitoring at any level proved to be an ineffective tool and amounts to nothing more than an exercise in futility. Whichever version is closer to the truth, the inescapable conclusion is that defendants themselves have demonstrated that nothing short of closure will eliminate the proscribed conduct.
Defendants seek another opportunity by proposing new measures to stop the activity. The court finds that installing recently purchased high-resolution cameras, and engaging the services of a new security firm are simply more of the same. WThile cameras will permit a monitor to view the entire Theater as if it were lighted, and enable the monitor to take corrective actions upon viewing any prohibited sexual activity, the cameras are only as effective as the persons monitoring them. Given the testimony that the Theater monitors were less than vigilant in their own duties, this new enforcement tool is doomed to failure. With respect to hiring a new security firm, defendants failed to call as a witness a principal from this firm, who presumably would have detailed the techniques the firm would have employed that would be different and more effective than prior monitoring approaches.
Defendants maintain that Arcara (supra) mandates that plaintiffs either arrest the violators or seek to enjoin their activity. They argue that by failing to undertake these measures plaintiffs have not satisfied their burden under Arcara and are not entitled to a continuation of the closing order. This argument which was raised by the dissenters in Islip (supra) has been rejected by the Islip majority as "absolutist” (Matter of Town of Islip v Caviglia, supra, 73 NY2d, at 559). By stating that the asserted governmental interest in Arcara "could” have been secured by criminal proceedings or injunction, short of closure, the Islip majority interpreted Arcara as suggesting arrests and injunctions as alternatives, rather than mandates, and that such alternatives were in response to the prosecutor’s failure to take any steps whatsoever prior to seeking closure of the bookstore (Matter of Town of Islip v Caviglia, supra, 73 NY2d, at 559). In any event, given the testimonial evidence of the nature of the prohibited sexual activity and the frequency of the acts taking place in the Theater, as opposed to the scant evidence considered by the Court in Arcara, this court finds that "[t]o require the police to arrest patrons of the Cinema under little-used criminal statutes would embrace form *27 over substance”, and "[t]o first require injunctive relief in the face of the proven futility of any less intrusive solution would ignore the immediacy of the plague in our midst” (City of New York v Dana, 165 Misc 2d 409, 416 [Sup Ct, NY County 1995]).
Defendant Moody contends that because he was not given notice of the public nuisance and an opportunity to abate such nuisance plaintiffs are not entitled to a preliminary injunction enjoining him from using the premises in any way during the pendency of this action. Moody’s father, now deceased, entered into a triple net lease with the Theater in April 1968, which required the Theater to pay all expenses relating to the premises including maintenance, repairs, real estate taxes, and all applicable insurance coverages. The lease also required the Theater to pay for all expenses related to compliance with all applicable laws and regulations. When the triple net lease expired, defendant Moody and his sister, who is not a party to this action, entered into a new lease on April 1, 1983. Similar to the first lease, this lease, which was renewed three times, contained language under which the Theater agreed to observe and comply with all applicable Federal, State and city laws and regulations. Moody who did not testify because of an alleged heart condition states in his unchallenged affidavit that he had no knowledge of the existence of any public nuisance taking place in the Theater. Moody’s counsel represented that "he never, in 27 years, visited the premises.” The issue with respect to Moody is whether liability for the public nuisance can be imputed to Moody, as an absentee owner of the premises, if he neither had notice of the nuisance, nor created the nuisance.
Administrative Code § 7-707 (a) provides that a court may grant a preliminary injunction enjoining a public nuisance and "the person or persons conducting, maintaining or permitting the public nuisance.” The court’s jurisdiction is in rem and its orders are enforced against the premises (City of New York v Castro, 160 AD2d 651, 652 [1st Dept 1990]). Since the personal fault of the owner is not a material consideration, a preliminary injunction may be granted against defendant Moody based on the prima facie showing that a public nuisance has existed on the premises (supra). Assuming arguendo that personal fault is a material consideration, this court finds simply incredible Moody’s claim that he has not visited the premises for 27 years. While he may have delegated all responsibility to the tenant under the lease, such lease provisions are not self-executing and require him to inspect the *28 premises to ensure compliance. As an absentee landlord, Moody proceeds at his own peril, and may suffer legal consequences as a result of his do-nothing policy (see, City of New York v Castro, supra, 143 Misc 2d, at 768). Even if Moody were unaware of the activity taking place in the Theater, this lack of knowledge would not necessarily bar plaintiffs from obtaining injunctive relief against him because an absentee landlord, such as Moody, is presumed to have knowledge of how his property is being used (supra, at 768, citing Pennoyer v Neff, 95 US 714 [1877]). In any event, this court finds that Moody acquired notice of the public nuisance occurring on his premises on August 29, 1995 when he was served with the order to show cause temporarily closing the Theater. Since that time, he has failed to undertake any measure to eliminate the nuisance except to join with the other defendants in this action to oppose the instant motion. Under these circumstances, defendant Moody’s do-nothing approach should not insulate him from liability (cf., City of New York v New King Cinema Corp., NYLJ, July 24, 1995, at 30, col 2).
Accordingly, plaintiffs’ motion against defendants is granted.