JANE DOE et al., Respondents, v DAVID AXELROD, as Commissioner of Health of the State of New York, Appellant.

First Department, April 28, 1988

### APPEARANCES OF COUNSEL

*Leon D. Lazer* of counsel *(George G. Nelson* and *Beth A. Fox* with him on the brief; *Shea & Gould,* attorneys), for respondents.

*Darren O'Connor* of counsel *(Robert Abrams, Attorney-General,* attorney), for appellant.

### OPINION OF THE COURT

ASCH, J.

The dissent is an extensive legal and medical tract. However, the only issue now before us is the very narrow one of whether Special Term improperly granted a preliminary injunction temporarily restraining the New York State Commissioner of Health from putting the instant regulation into immediate effect, in advance of a trial. Such a trial will provide a broad forum for the expression of expert medical and public health authority on the efficacy of the proposed regulation, instead of what seems to be a rather skewed sample submitted by the Commissioner in support of his project.

■ We agree with the determination by the Justice at nisi prius that questions as to the legality of the regulation, as well as the impact of its imposition on millions of New York citizens and the practice of medicine, warrant a delay until a final determination is made on the merits.

Plaintiffs are a coalition including a patient, two physicians, a pharmacist, several pharmaceutical manufacturers, and the Medical Society of the State of New York. They brought this action, in June 1987, to declare the Commissioner's promulgation of this amended regulation unconstitutional and beyond his authority, asserting that such directive constituted an unauthorized exercise of power, was arbitrary and capricious and was not in furtherance of or consistent with the purposes of the Controlled Substances Act. They asserted that the regulation imposed an unacceptable burden on the medical and pharmaceutical professions, that it interfered with medical care of patients by doctors, that it constituted an invasion of privacy, and that it violated the provisions of sections 202-a and 202-b of the State Administrative Procedure Act and the Interstate Commerce Clause of the United States Constitution.

Plaintiffs have raised very substantial medical, as well as legal, issues of constitutional magnitude. They assert that the

regulation in dispute requires that certain frequently prescribed tranquilizing medications officially known as benzodiazepines be subjected to the strict prescription control reserved for drugs of the greatest abuse, under the provisions of New York's Controlled Substances Act (Public Health Law §§ 3300-3397). Specifically, the regulation mandates that the physician use a printed prescription form provided by the State; limits the patient to a 30-day nonrefillable supply of the medication; compels the physician to see the patient every month in order for the patient to continue to receive such medication, even if the physician considers such a visit unnecessary; causes the patient's name, the physician's name, the pharmacy's name, and the type, quantity and dosage of the medication to be entered in the State's computerized drug enforcement records each time such a prescription is issued, thereby showing that the patient is under treatment involving the strictest State drug abuse surveillance; and makes it illegal for a New York pharmacy to fill a prescription for these medications written by a physician in a neighboring State.

At the present time, only the drugs found in Schedule II, which present an extremely high risk for abuse, are required to be prescribed on official New York State prescription forms, of which one copy is retained by the physician, one by the pharmacist and one forwarded to the State for entry in the State's computer banks. Only a 30-day supply may be prescribed and refills may not be obtained. On the other hand, drugs under a Schedule IV, such as Valium, may be prescribed on ordinary prescription forms, and with certain exceptions may be prescribed only for 30 days, but the prescriptions may be refilled as the physician has indicated.

We concede that the Controlled Substances Act expressly authorizes the Commissioner by rule or regulation to require that Schedule III or IV drugs be prescribed only upon official New York State prescription blanks (Public Health Law § 3338 [3]).

However, plaintiffs argue that while one of the purposes of the statute was to control and prevent the illicit flow and marketing of legal but dangerous drugs, the real and admitted purpose of the Commissioner in promulgating this amended regulation was to inhibit the use and dispensing of these drugs in New York by forcing a 25% reduction in the sale of benzodiazepines. The ulterior motive ascribed to the Commis-

sioner is that, as a result, Medicaid expenditures in this State would be considerably reduced.

The plaintiffs contend, on the other hand, that the primary intent of the Controlled Substances Act was to "stem the flow of dangerous drugs to the illicit market" (Jan. 1972 Interim Report of Temporary State Commn to Evaluate the Drug Laws, 1972 NY Legis Doc No. 10, at 7) rather than to further the personal, social and medical aims of the Commissioner.

Finally, the fact asserted by the Commissioner, that 39 proceedings against health care professionals allegedly have been instituted by the Health Department for the improper handling of benzodiazepines, must be viewed in its proper context. There are over 50,000 physicians in the State and, no doubt, at least as many nurses and pharmacists. The purported illicit diversion of benzodiazepines by 39 health care professionals over an unstated period of time, as the plaintiffs assert, is woefully scant evidence of any serious problem. These statistics are utterly dwarfed by the fact that, according to the Commissioner's estimate, 8,000,000 benzodiazepine prescriptions were written in New York in 1985 alone. We agree with the plaintiffs that it is amazing that the Commissioner can argue that 39 proceedings covering alleged violations for an unstated number of years can be offered as a rational basis for putting a vast number of people in this State under drug abuse surveillance and interfering with the physician-patient relationship of many millions more in the future.

Thus, the claim by plaintiffs that the New York Commissioner adopted the disputed regulation not to prevent the flow of tranquilizers to the underground market, but rather to curb the prescribing practices of physicians who in good faith are prescribing these medications to their patients, has a prima facie validity. They contend that the proposed rule intrudes upon the physician-patient relationship and is an ill-disguised attempt by the Commissioner to impose his philosophy that tranquilizers are "legitimately" overprescribed, despite the good-faith belief of many medical practitioners that such is not the case.

It is well-established law that, to be granted a preliminary injunction under New York law, the movant must establish a likelihood of success on the merits, irreparable injury absent a granting of the injunction, and a balancing of the equities in its favor (see, e.g., Grant Co. v Srogi, 52 NY2d 496, 517).

These requirements are certainly met here. Enforcement

of the regulation will bring about an enormous governmental intrusion into the doctor-patient relationship, posing a threat to physicians who in good faith prescribe larger amounts of benzodiazepines than the Commissioner, as a physician, might himself prescribe under similar circumstances. Certainly, the equities favor plaintiffs since they seek only to preserve the status quo pending determination of the issues. No harm will result to the commonweal by reason of a delay of a few months in implementing the regulation, assuming its validity is upheld.

On the other hand, the injuries which will occur at this time if the regulation takes effect will be significant and irremediable. As noted, there will be wholesale intrusions into the confidentiality of the doctor-patient relationship. The State Government will have a computerized record of every person who suffers from anxiety or depression and for whom tranquilizers are prescribed. Many millions of New Yorkers who suffer from psychological maladies will, in effect, have to register this disability in a central governmental registry. Possibly many of them may refuse needed medication for fear of their jobs or reputations.

Many physicians may succumb to their desire to avoid the administrative "red tape", or the possibility that they may be investigated for their prescribing of tranquilizers, and not prescribe such medication even where its use would help the patient. The old and poor would be seriously affected by the costs and burden of monthly visits to their physicians, so that they will forego needed medicine. Executives, public officials and those similarly situated may well fear the job consequences of having their names on a roster of those using tranquilizers. The equities, therefore, are heavily in favor of continuing the injunctive relief until trial.

Plaintiffs contend that Public Health Law § 3338 (3) is an unconstitutional delegation of legislative power to the Commissioner.

The New York Controlled Substances Act was intended to be and is consistent with the Federal Controlled Substances Act (21 USC §§ 801-966) to the fullest extent practicable. It created the same set of classifications (Public Health Law § 3306). In New York, however, the inclusion of a new pharmaceutical preparation in a particular classification or the change of a classification to a more strictly controlled one was specifically reserved to the State Legislature. On several occa-

sions the Legislature has enacted statutes adding new pharmaceuticals to the schedules (see, L 1986, ch 826; L 1981, ch 474; L 1981, ch 455). In all cases the Legislature has followed the determination of the Federal authorities.

In 1975, after a medical, scientific and administrative review, the benzodiazepines were classified by the Federal controlled substance authorities in Schedule IV. Thereafter, the New York State Legislature included them in Schedule IV under the New York Controlled Substances Act. This classification has been preserved after more recent review of the benzodiazepines.

As recently as 1985, the State Legislature reenacted the schedules to reflect additional drugs, including new benzodiazepines. At that time (consistent with Federal regulation), it included *all* controlled benzodiazepines in Schedule IV (see, L 1985, ch 664, § 1).

The Federal authorities have not reclassified benzodiazepine products from Schedule IV to Schedule II. The New York State Legislature has not done so either, and benzodiazepine products remain Schedule IV substances under the New York Controlled Substances Act.

The Legislature ostensibly empowered the Commissioner to designate, by rule or regulation, any additional substances listed in Schedules III or IV as being subject to the triplicate requirement and the other restrictive regulations (Public Health Law § 3338 [3]). The Commissioner exercised this authority by amending his Department's regulations to extend the triplicate prescription requirement over the drugs in Schedule IV known as benzodiazepines.

■ Whether the Legislature actually contemplated that the Commissioner would actually extend the sweep of the regulations governing the prescription and use of the most dangerous drugs to tranquilizers, and whether the Legislature contemplated that the millions of users, prescribers and dispensers would be enrolled upon a State roster, raises a question of legislative intent which should be explored. Finally, if the Legislature so intended, as the short history of this statute shows, the plaintiffs have raised a real issue of whether this was a proper delegation of legislative authority.

What this court must decide is whether the Commissioner's fiat requiring registry of tranquilizer prescriptions should go into immediate effect without a trial, despite the fact that large segments of the medical profession profoundly disagree

with the effort to transform a statute enacted to restrict illicit diversion of drugs into a statute that imposes upon the medical profession the Commissioner's view as to how and how often tranquilizers should be prescribed to those who need them.

The recent case of *Boreali v Axelrod* (71 NY2d 1) gives much support for the view expressed here that the regulation should be subjected to comprehensive legal scrutiny at a trial, rather than adopted in the summary fashion sought by the respondents. In *Boreali (supra),* the Court of Appeals struck down regulations proposed by the Commissioner of Health when his Public Health Council promulgated a code to govern tobacco smoking in areas that are open to the public.

The court, in the opening paragraph of its opinion, forthrightly set forth the essential basis for its decision: "We hold that the Public Health Council overstepped the boundaries of its lawfully delegated authority when it promulgated a comprehensive code to govern tobacco smoking in areas that are open to the public. While the Legislature has given the Council broad authority to promulgate regulations on matters concerning the public health, the scope of the Council's authority under its enabling statute must be deemed limited by its role as an administrative, rather than a legislative, body. In this instance, the Council usurped the latter role and thereby exceeded its legislative mandate, when, following the Legislature's inability to reach an acceptable balance, the Council weighed the concerns of nonsmokers, smokers, affected businesses and the general public and, without any legislative guidance, reached its own conclusions about the proper accommodation among those competing interests. In view of the political, social and economic, rather than technical, focus of the resulting regulatory scheme, we conclude that the Council's actions were ultra vires and that the order and judgment of the courts below, which declared the Council's regulations invalid, should be affirmed." *(Boreali v Axelrod, supra,* at 6.)

Likewise, in this case, plaintiffs have set forth at least a prima facie showing that the Commissioner promulgated this regulation imposing the various restrictions on the tranquilizers not because of purely health considerations within his province, but because of social and economic (if not also political) considerations which are solely within the Legislature's province.

The Appellate Division, in that case, as cited by the Court of Appeals, noted that the challenged smoking regulation " 'effectuate[d] a profound change in social and economic policy' and that the agency had obviously based the details of its regulatory scheme as much on concerns about 'economic impact' as on considerations of public health" *(Boreali v Axelrod, supra,* at 8).

In his discussion of separation of powers as applied to the *Boreali* smoking code, Judge Titone, writing for the majority, explained *(supra,* at 9-11):

"However facially broad, a legislative grant of authority must be construed, whenever possible, so that it is no broader than that which the separation of powers doctrine permits *(see,* Tribe, American Constitutional Law § 5-17, at 288-289). Even under the broadest and most open-ended of statutory mandates, an administrative agency may not use its authority as a license to correct whatever societal evils it perceives *(see, e.g., Matter of Council for Owner Occupied Hous. v Abrams,* 125 AD2d 10). Here, we cannot say that the broad enabling statute in issue is itself an unconstitutional delegation of legislative authority. However, we do conclude that the agency stretched that statute beyond its constitutionally valid reach when it used the statute as a basis for drafting a code embodying its own assessment of what public policy ought to be * * *

"A number of coalescing circumstances that are present in this case persuade us that the difficult-to-define line between administrative rule-making and legislative policy-making has been transgressed. While none of these circumstances, standing alone, is sufficient to warrant the conclusion that the PHC has usurped the Legislature's prerogative, all of these circumstances, when viewed in combination, paint a portrait of an agency that has improperly assumed for itself '[t]he open-ended discretion to choose ends' (Tribe, *op. cit.,* at 285), which characterizes the elected Legislature's role in our system of government."

Plaintiffs have made enough of a showing on the motion before us to establish a likelihood of success in their contention that the Commissioner acted in excess of his powers, even though those powers delegated to the Commissioner are very broad. "Striking the proper balance among health concerns, cost and privacy interests, however, is a uniquely legislative function" *(Boreali v Axelrod, supra,* at 12).

As the nisi prius court concluded, these issues are of such serious import that this regulation should not become effective without exploration of them and their ramifications. Vast numbers of New Yorkers are entitled to the protection of an adversarial test of the propriety and constitutionality of this contested regulation. "Here, plaintiffs predicate their right to ultimate relief upon an argument that * * * may not prove to be ultimately successful, but it is based on substantial principles of constitutional law and involves novel issues of first impression * * * This is precisely the situation in which a preliminary injunction should be granted to hold the parties in *status quo* while the legal issues are determined in a deliberate and judicious manner (see, especially, *New York Life Ins. Co. v Pink,* 77 NYS 2d 612, 613; *Coler v American Soc. for Prevention of Cruelty to Animals,* 122 NYS 549, 550-551; cf. *Borden's Co. v Baldwin,* 293 US 194, 213; cf. *Matter of Schwartz v Rockefeller,* 38 AD2d 995, 996 [Cooke, J., concurring], app dsmd 30 NY2d 664). In view of the conceded irreparable harm facing plaintiffs as contrasted with the damage the State would face by postponing implementation of the statute until this case can be heard on its merits, Special Term properly exercised its discretion by granting plaintiffs' motion for a preliminary injunction *(New York Life Ins. Co. v Pink, supra,* p 613)." *(Tucker v Toia,* 54 AD2d 322, 326.)

We agree, however, with the procedural conclusion of the dissent that the nisi prius court erred in converting these actions into a CPLR article 78 proceeding.

Accordingly, the order of the Supreme Court, New York County (Edith Miller, J.), entered on December 3, 1987, which *sua sponte* converted the instant declaratory judgment action into a proceeding pursuant to CPLR article 78 and granted plaintiffs' application for a preliminary injunction, should be modified, on the law, to restore the matter to a declaratory judgment action, and otherwise affirmed, without costs or disbursements.

KUPFERMAN, J. P. (concurring). I have been vouched into this matter to be the determining factor, and I think both positions are sound.

While I believe that the opinion authored by Justice Milonas will and should ultimately prevail *(cf.,* Bellacosa, J., dissenting in *Boreali v Axelrod,* 71 NY2d 1, 16), there is sufficient doubt as to the legality of the regulation, as Justice

Asch presents it, to affirm granting the preliminary injunction preventing its effectiveness in advance of trial.

MILONAS, J. (dissenting in part). This action involves a challenge by plaintiffs, representing various patients, pharmacists, physicians, drug companies and the Medical Society of the State of New York, to the adoption and implementation by defendant Dr. David Axelrod, Commissioner of Health of the State of New York, of a regulation (10 NYCRR 80.67) which was scheduled to take effect on July 1, 1987. Pursuant to this regulation, certain frequently prescribed medications collectively known as benzodiazepines, a group of tranquilizers containing the well-known drug Valium, may only be dispensed upon official New York State prescription forms. It is plaintiffs' contention that the regulation lacks a rational basis, that the enabling act under which it was promulgated (Public Health Law § 3338 [3]) is an unconstitutional delegation of power and that, moreover, the regulation violates sections 202-a and 202-b of the State Administrative Procedure Act, as well as the Commerce Clause of the United States Constitution.

### STATUTORY SCHEME

The New York State Controlled Substances Act (Public Health Law art 33), which was patterned on Federal law, was enacted in 1972 for the purpose of providing a comprehensive and "more timely system for regulating the flow of dangerous drugs into and within the state" in order "to protect the public and *prevent* unlawful access to dangerous drugs" (Jan. 1972 Interim Report of Temporary State Commn to Evaluate the Drug Laws, 1972 NY Legis Doc No. 10, at 7). Therefore, unless otherwise expressly authorized, "the provisions of this article shall govern and control the possession, manufacture, dispensing, administering, and distribution of controlled substances" (Public Health Law § 3301), and, accordingly, except where expressly allowed, "[i]t shall be unlawful for any person to manufacture, sell, prescribe, distribute, dispense, administer, possess, have under his control, abandon, or transport a controlled substance" (Public Health Law § 3304 [a]). Those drugs which had been "found to have a high potential for abuse" were designated as controlled substances (Jan. 1972 Interim Report of Temporary State Commn to Evaluate the Drug Laws, 1972 NY Legis Doc No. 10, at 20). They were then classified into five separate schedules, depending upon the

level of dangerousness (Public Health Law § 3306) and ranging from the most addictive, including opiates, opium derivatives, marihuana, mescaline and methaqualone (Schedule I), to amphetamines, methadone, amobarbital, pentobarbital (Schedule II), to barbiturates (Schedule III), tranquilizers such as diazepam (Valium), lorazepam (Ativan) and alprazolam (Xanax) (Schedule IV), to codeine (Schedule V).

The substances enumerated in Schedule I are effectively banned from commerce. Schedule II contains drugs that have a high potential for abuse but since they do have certain legitimate medical purposes, these ·substances are available under strict control. The remaining schedules list pharmaceuticals which have a decreasing potential for abuse and more widespread general medical application and may be dispensed under far less restriction. Indeed, certain drugs in Schedule V may be legally purchased without a prescription.

Section 3331 (2) of the Public Health Law permits a physician "in good faith, and in the course of his professional practice only" to "prescribe, administer and dispense substances listed in schedules II, III, IV, and V, or he may cause the same to be administered by a designated agent under his direction and supervision." All prescriptions of controlled substances, regardless of whether or not the official New York State form is used, must be prepared in the manner and contain the same information required by section 3332 (2) of the Public Health Law (see, Public Health Law § 3335 [2]). However, the drugs enumerated in Schedule II may be dispensed only upon official New York State prescription forms (Public ·Health Law § 3338 [2]). The practitioner must prepare, deliver and retain copies of those written on New York State forms, also referred to as triplicate forms. In that regard, section 3331 (6) of the Mental Health Law requires that the physician keep one copy of the New York State form for five years and file the original and one copy with the Department of Health. Another original and copy must be delivered to the patient (Public Health Law § 3332 [4]). In addition, the pharmacist filling the prescription "shall endorse upon the original and copy thereof the date of delivery, his signature, and the registration number of the pharmacy" (Public Health Law § 3333 [3]). The endorsed original prescription must be retained by the pharmacist for five years and the endorsed copy filed with the Department of Health (Public Health Law § 3333 [4]). Official New York State forms are serially numbered and are issued to physicians and to institutional dispen-

sers by the Department of Health at a cost of 25 cents each (Public Health Law § 3338 [1]).

When traditional prescription forms are utilized, a practitioner may not prescribe more than a 30-day supply of any controlled substance, or a 90-day supply for the treatment of certain specified disorders (Public Health Law § 3335 [3]; 10 NYCRR 80.69 [d]), and the user must exhaust all but a 7-day supply of the substance before a new prescription may be issued (Public Health Law § 3335 [3]). A prescription on an official New York State form is subject to the same restrictions on the maximum permissible supply per prescription (30 or 90 days), and the prohibition on additional prescriptions until the user has only a 7-day supply remaining (Public Health Law § 3332 [3]; 10 NYCRR 80.71 [d]). However, a "practitioner may orally prescribe and a pharmacist may dispense to an ultimate user controlled substances in schedules III, IV or V for which an official New York state prescription is not required" provided that certain requirements are met and a written prescription is forthcoming within 72 hours (Public Health Law § 3337). Moreover, an official New York State prescription may not be refilled, whereas an ordinary written prescription may be refilled for a period of up to six months (Public Health Law § 3339).

Although a triplicate system does not limit the right of a physician to prescribe any controlled substance not contained in Schedule I, it does enable State authorities to maintain a record of the dispensation of certain drugs for the reason noted in the January 1972 Interim Report of the Temporary State Commission to Evaluate the Drug Laws (1972 NY Legis Doc No. 10, at 21): "Once the department has received the copies, it will be able to compile data which will uncover irregularities such as forgeries, fraudulent obtaining of schedule II substances, and thefts of prescription blanks and their misuse by unauthorized persons. The information received by the department will show if a patient has obtained prescriptions by going from doctor to doctor, or if stolen prescriptions are being used. This procedure will also indicate where there has been an over-prescribing or over-dispensing of schedule II drugs."

In order to protect the user from the unauthorized disclosure of his or her identity, section 3370 (3) of the Public Health Law mandates the destruction of the name of any patient within five years of the date of receipt thereof. While the records required to be kept by the Public Health Law are

still in existence, they are available only "during business hours for inspection and copying by any officer or employee of the department who is charged with the enforcement of this article and to any officer or employee of this state charged with the duty of regulating or licensing of any person who by virtue of such license is authorized to obtain, distribute, dispense or administer controlled substances" (Public Health Law § 3370 [2]). No person who has access to this information may reveal knowledge derived therefrom or any report or record thereof, except to other Department of Health employees for the purpose of executing the Controlled Substances Act, pursuant to judicial subpoena or court order in a criminal investigation or proceeding, to an agency or other governmental subdivision permitted to deal in controlled substances, or to a central registry under the Controlled Substances Act (Public Health Law § 3371). A willful violation of the confidentiality provisions is a crime punishable by up to one year in jail and a fine (Public Health Law § 12-b [2]).

Notwithstanding the fact that official New York State prescription forms are statutorily required only for Schedule II substances (Public Health Law § 3338 [2]), the Legislature has expressly allowed the Commissioner of Health to impose the triplicate system upon Schedule III or Schedule IV drugs. According to section 3338 (3) of the Public Health Law: "The commissioner may, by rule or regulation, require that a particular substance in schedule III or schedule IV, or particular preparations containing such substance, be prescribed or dispensed upon an official New York state prescription."

### ADMINISTRATIVE PROCEEDINGS

The Commissioner of Health, confronted with mounting evidence of the harmful effects of benzodiazepines, the widespread consumption and abuse of these drugs, as well as their increasing distribution, over-prescription and illegal diversions, presented his concerns to the Public Health Council. The Public Health Council consists of the Commissioner of Health and 14 members who are appointed by the Governor with the advice and consent of the Senate (Public Health Law § 220). The law mandates that the Council consider, at the request of the Commissioner, "any matter relating to the preservation and improvement of public health, and may advise the commissioner thereon" (Public Health Law § 225 [1]). Following the Council's receipt on September 26, 1986 of

the Commissioner's proposal that the "extensive abuse and misuse of Valium and the other Benzodiazepines" warranted consideration by it of "utilizing the triplicate prescription programs as a mechanism of monitoring and controlling the use of these products", the Council announced that a public hearing would be held to assist it in formulating a recommendation with respect to this issue. At the ensuing hearing, which was conducted on November 14, 1986, testimony and written comments were offered both in support and in opposition to the suggested rule.

Expert opinion submitted on behalf of the Commissioner's proposal discussed the high rate of illicit trafficking in benzodiazepines through such means as theft of the drugs, forgery of prescriptions, the purchase of the substances from persons who had prescriptions for them and the procurement of prescriptions from multiple physicians. It was pointed out that some 70% of patients in long-term residence have been involved in the illegal use of Valium. Indeed, the abuse of benzodiazepines is not only a problem among adults, but is also prevalent with children, a situation which is particularly severe in New York. For example, one physician who is director of an adolescent program and an associate professor of public health and pediatrics, described the harmful effects of benzodiazepines as follows:

"The sedative hypnotic drugs of the benzodiazepine class, as I am sure you've heard this morning, are certainly high among the most over-prescribed and abused substances in the world today.

"In my work, I daily see young people, ages 16 to 23, who are under compulsion to use 20 to 600 milligrams of Valium daily, alone or in combination usually with alcohol and narcotics, if in combination.

"There are not sufficient detoxification or treatment facilities for these patients in New York City or elsewhere.

"Although my clinical experience has clearly oversensitized me to the abuse and addictive potential of the benzodiazepines, I am also well aware of the general ease of prescribing these medications in our own medical practices.

"They often represent a seductively simple solution to the myriad problems of everyday life and medical or psychiatric conditions which would be better treated by other means, such as psychotherapy or chemical dependence treatment.

"The prescribing of these drugs has become a professional livelihood, as well as a major industry.

"We are encouraged to make life anxiety-and pain free, seeking an easy short-term solution. It is certain that the most frequent victims in our society are the anxious, depressed female patients and alcohol abusers.

"The alcoholic often does not get the treatment he needs because of temporizing and substituting of these drugs.

"Benzodiazepines are the very food of denial. These medications are also commonly the devisive [sic] factors in emergency room episodes, suicides, usually in combination with alcohol or other drugs.

"The suicide gesture so frequently, especially among adolescent females, thus becomes the fatal facts due to the unanticipated synergism of the drugs."

There was also testimony regarding the great difficulty which people experience in overcoming their dependence upon benzodiazepines, and, it was asserted that because these drugs are often misused in connection with the treatment of alcoholism, dual dependence is a common condition. These substances are similarly misused in treating mental health clinic patients. In addition, experts stated that benzodiazepines are the prescription drugs which are most frequently present in persons who die of unnatural causes, including suicide, and constitute a significant cause of drug-related deaths. Indeed, one medical examiner submitted a letter in which he observed that more than 30% of the drug-related deaths in his county were attributable to benzodiazepines. Evidence before the Public Health Council also indicated that therapeutic levels of these substances seriously impede driving skills and that the blood testing of arrested drivers has revealed them to be present more often than is any other drug, exceeding in frequency cocaine, opiates and barbiturates by a substantial margin. Moreover, according to those individuals who supported the proposed regulation, there is no proof that use of the triplicate system in various other States has decreased the legitimate use of the drugs involved.

Those persons who opposed adoption of the rule, most of whom represented drug manufacturers or certain organizations (the New York State Psychiatric Association, Empire State Pharmaceutical Society, the Professional Advisory Board of the Epilepsy Institute, etc.), urged that the regulation would result in increased administrative costs; that it would be unduly burdensome to patients because added visits to physicians and examinations would be required; that benzo-

diazepines can be beneficially utilized, and further regulation will discourage physicians from prescribing them even in appropriate situations; that patients' right to privacy would be violated; that there is inadequate documentation to show a relationship between the use and abuse of benzodiazepines and various societal problems; and that insofar as overuse and misuse of these drugs does entail societal costs, a preferable alternative to more regulation is an educational program for both physicians and the public.

On February 6, 1987, the Public Health Council voted unanimously (one member abstaining) to concur with the intention of the Commissioner of Health to issue the rule. Besides soliciting the advice of the Council, the Department of Health, pursuant to the State Administrative Procedure Act, published a notice of proposed rulemaking in the New York Register. According to this notice, the purpose of the proposed amendment to 10 NYCRR 80.67 (a) which would require benzodiazepine prescriptions to be written on official New York State forms, was to "monitor the prescribing of the benzodiazepines in order to assure that these controlled substances are properly used." The notice then set forth the text of the proposed regulation and also included a regulatory impact statement describing the need for the triplicate system with respect to benzodiazepines, the benefits expected to be derived therefrom, the costs anticipated as a result of the new procedure, the paperwork necessary and the lack of available alternatives. The statement asserted in part that:

"The writing of an estimated 6.4-8.6 million prescriptions of benzodiazepines statewide is of paramount public health concern when compared to the drugs' potential for adverse reactions, clinical dependency and abuse.

"Recent studies clearly indicate that benzodiazepines are at substantial risk for abuse resulting in morbidity and mortality. Reports from emergency rooms in New York State indicate that, for drug related admissions, benzodiazepines represent six out of the top 20 drugs, with Diazepam admissions third, only behind heroin and cocaine.

"Investigations by the Department of Health and other agencies show that the abuse of benzodiazepines has reached a level of concern, threatening the health and welfare of the people of the State. New and more potent benzodiazepine agents are becoming available and are increasingly abused.

"Educational efforts initiated in the 1970's have not reduced

the overall abuse associated with the prescribing and dispensing of benzodiazepines.

"Concomitantly, there is no informational process in place that allow the monitoring of benzodiazepines for the purpose of analysis and investigation.

"Based upon past experience and information provided by the Department of Health Triplicate Prescription Program, inclusion of the benzodiazepines in the category of drugs requiring an official New York State form will permit monitoring of the drugs prescribed in order to assure proper use and substantially reduce the abuse. The adoption of the proposed rule should not affect the legitimate administration of these substances either in the institutional or private setting.

"The information gained by the Department of Health through the Triplicate Prescription will be utilized for both compliance and educational activities * * *

"Overt illegal activity is substantially curtailed through the triplicate prescription form. In 1985, the Bureau of Controlled Substances reported no reports of counterfeiting of triplicate prescriptions. Regular prescription blanks are readily printed, photocopied and stolen by the thousands. The Bureau of Controlled Substances responds only to major forgery diversion because of the difficulties of forgery cases involving regular prescription blanks. The Department, however, currently has 42 separate cases pending prosecution which involve the falsification of prescriptions to obtain benzodiazepines."

The notice of proposed rulemaking contained, in addition, a regulatory flexibility analysis which discussed the effect on small businesses of the proposed rule, the compliance costs and the reporting, record keeping and other compliance requirements. In the view of the Department of Health, extension of the triplicate system to benzodiazepines "is expected to have little economic impact on the regulated party. Options are being examined to assure the most efficient, cost effective reporting systems." The published notice apparently elicited a variety of comments because the Commissioner of Health thereafter prepared a detailed assessment of those comments in which he responded point by point to the reservations expressed by the opponents of the proposed regulation. Among the concerns which the Commissioner endeavored to alleviate was the fear that the prohibition against refilling triplicate prescriptions would cause unnecessary doctor visitation and,

therefore, create added expense and inconvenience to patients suffering from acute or chronic conditions. Addressing that matter, the Commissioner declared that it would not have such an effect for the reason that:

"Triplicate Prescriptions may be made for a quantity of drug, not exceeding a thirty-day supply, based upon directions for use. For certain chronic conditions specified in regulation, a three-month supply may be prescribed. Subsequent prescriptions may be issued a week prior to the expiration of the previous prescription. The chronic conditions for which a three-month supply may be prescribed currently are:

"a. Minimal brain dysfunction (hyperkinesis) in patients not more than 15 years of age;

"b. convulsive disorders;

"c. relief of pain in patients 65 years of age and over suffering from diseases known to be chronic and incurable; and for

"d. narcolepsy.

"The acute or short term illness for which benzodiazepines are prescribed as sedatives are most frequently insomnia, pain or anxiety.

"The 'Desk Reference of Drug Misuse and Abuse' published in 1984, by the New York State Medical Society's Drug Abuse Committee, the New York State Division of Substance Abuse Service, the New York State Department of Health, and the New York State Office for the Aging, states in part:

" 'A sedative medication for relief of insomnia, pain, anxiety or depression should be avoided if possible. In general, sedative-hypnotic medications should be prescribed only for the relief of severe symptoms.

" 'A federal Institute of Medicine study available from the National Association of Sciences has recently reported on the safety and effectiveness of sedative-hypnotic drugs. A reduction in drug treatment and a shift in products used from barbiturates to benzodiazepines is an apparent response to concerns about the abuse and accidental deaths or suicide with barbiturates.'

"In addition, the report:

"2. '—challenged the impression that the benzodiazepine hypnotics are safer and more effective than the barbiturates.
* * *

" '—advises physicians to restrict the use of hypnotic drugs for insomnia to short-term treatment. There is little evidence

that sedative-hypnotics in general continue to be effective when used nightly over long periods' * * *

"Based upon these considerations, the thirty day supply with exceptions for certain chronic conditions is in the best interests of the patients."

In his assessment, the Commissioner recognized that benzodiazepines do have many legitimate therapeutic uses. Nonetheless, he concluded that the level of abuse and misuse of these substances, as identified by the scientific literature, the evidence presented before the Public Health Council and the findings of experts, mandates that their use be monitored through the triplicate prescription process. Citing the problems associated with benzodiazepine intake, the Commissioner in his report specifically referred to unnatural deaths, suicides, emergency room admissions, misuse in the treatment of alcoholism, driving impairment, prescribed addiction, perinatal impact, abuse among children, household abuse, pervasiveness of use and diversions by individuals, health care professions and in the Medicaid program.

The subject amendment, which was to become effective on July 1, 1987, was thereafter filed on March 18, 1987. On April 18, 1987, the Department of Health published a notice of adoption in the New York State Register. Codified at 10 NYCRR 80.67, the regulation provides that:

"(a) Prescriptions for schedule II substances and

| | |
|---|---|
| "Alprazolam | Haloxazolam |
| "Bromazepam | Ketazolam |
| "Camazepam | Loprazolam |
| "Chlordiazepoxide | Lorazepam |
| "Clobazam | Lormetazepam |
| "Clonazepam | Medazepam |
| "Clorazepate | Nimetazepam |
| "Clotiazepam | Nitrazepam |
| "Cloxazolam | Nordiazepam |
| "Delorazepam | Oxazepam |
| "Diazepam | Oxazolam |
| "Estazolam | Pinazepam |
| "Ethyl Loflazepate | Prazepam |
| "Fludiazepam | Temazepam |
| "Flunitrazepam | Tetrazepam |
| "Flurazepam | Triazolam |
| "Halazepam | |

shall be issued on the official New York State prescription form and shall not be refilled."

## ISSUANCE OF PRELIMINARY INJUNCTION

Plaintiffs commenced this declaratory judgment action on or about June 1, 1987 seeking to have the regulation declared null and void. In the first cause of action, they allege that the regulation is "arbitrary, capricious, deliberately and unnecessarily burdensome, and an illegal and unauthorized exercise of power by the Commissioner and contrary to law." The second and third causes of action assert that the regulation violates sections 202-a and 202-b, respectively, of the State Administrative Procedure Act in that it is contrary to the objectives of the Controlled Substances Act and imposes undue burdens and adverse economic impact upon persons affected by it. The fourth cause of action charges that since the statute granting the Commissioner the authority to adopt the regulation in question contains no criteria governing the exercise of that authority, and neither the Public Health Law nor the Commissioner has provided for a hearing or a record upon which the determination to issue the regulation was made, the State has deprived plaintiffs of their Federal and State constitutional right to due process. Finally, in the fifth cause of action, one plaintiff claims a violation of the Commerce Clause of the United States Constitution.

Plaintiffs subsequently moved by order to show cause for a preliminary injunction to prohibit the Commissioner from enforcing the regulation pending resolution of the action. In granting the application, the Supreme Court found that based upon the conflicting affidavits and exhibits submitted, it was unable to make a final determination on the merits of the dispute between the parties, and, therefore, a trial was necessary. Invoking the exercise of its discretion, the court, consequently, directed a stay of enforcement against the regulation. In addition, the court *sua sponte* converted the matter into a proceeding pursuant to CPLR article 78 since "[a]n action to annul an official act of a public officer, on the ground that said officer has exceeded his jurisdiction, violated lawful procedure, abused his discretion, or acted in an arbitrary and capricious manner, must be brought pursuant to CPLR Article 78".

## ARTICLE 78 OR DECLARATORY JUDGMENT

At the outset, it should be noted that the Supreme Court erred in converting the instant action into an article 78 proceeding. The law is settled that a declaratory judgment, not an article 78 proceeding, is the proper vehicle to review

the validity of a legislative act *(Rivers v Katz,* 67 NY2d 485; *Matter of Kovarsky v Housing & Dev. Admin.,* 31 NY2d 184; *Matter of Lakeland Water Dist. v Onondaga County Water Auth.,* 24 NY2d 400). In that regard, a regulation promulgated by an administrative agency in the manner which occurred herein is deemed a legislative act *(Matter of Lakeland Water Dist. v Onondaga County Water Auth., supra,* at 407; *see also, Matter of Allstate Life Ins. Co. v Superintendent of Ins. of State of N. Y.,* 99 AD2d 278, *affd on opn below* 64 NY2d 962). In *Matter of Allstate Life Ins. Co. v Superintendent of Ins. of State of N. Y. (supra),* this court made reference to the fact that Special Term had perceived the essence of the matter therein as seeking a declaration that the administrative regulation in question was unconstitutional or inconsistent with certain provisions of the Insurance Law and had, thus, properly converted the article 78 proceeding into a declaratory judgment action (at 280). Consequently, plaintiffs appropriately commenced their lawsuit in the form of a declaratory judgment action.

### LIKELIHOOD OF SUCCESS—RATIONAL BASIS

As for the issue of whether plaintiffs are entitled to a preliminary injunction, the Supreme Court granted the application simply because it found disputed issues of fact to exist warranting a trial. Yet, regardless of whether or not there are unresolved factual questions here, a preliminary injunction may only be issued in accordance with certain legal standards. Thus, in order to procure the drastic remedy of a preliminary injunction, the moving party must establish a clear likelihood of success on the merits, irreparable injury absent the injunction and a balancing of the equities in its favor *(Yan's Video v Hong Kong TV Video Programs,* 133 AD2d 575; *Chester Civic Improvement Assn. v New York City Tr. Auth.,* 122 AD2d 715; *Bizar v Ohrenstein,* 119 AD2d 445; *Faberge Intl. v Di Pino,* 109 AD2d 235; *Little India Stores v Singh,* 101 AD2d 727). The Supreme Court, however, never considered whether plaintiffs have met their burden of demonstrating the foregoing three factors, and the failure to do so was itself error *(see, Faberge Intl. v Di Pino, supra).* Moreover, an examination of the record herein reveals that plaintiffs have not made the requisite showing, and, therefore, the preliminary injunction should not have been granted.

It is plaintiffs' contention that there was no rational basis

for adoption of the subject regulation since contrary to the claim by the Commissioner of Health that the regulation was enacted to deter the illegal trafficking in dangerous drugs, the real reason for his action was to impose his personal views on the manner in which benzodiazepines should be prescribed by physicians. In that connection, plaintiffs argue that the purpose of the Controlled Substances Act was to stem the illicit flow of dangerous drugs, which are being used and abused as recreational tools by those for whom they were never intended. The Commissioner, they urge, did not enact the regulation to deal with that problem but, rather, to bring about an over-all reduction in the utilization of benzodiazepines by physicians who are in good faith prescribing these medications to their patients. The majority appear to agree with plaintiffs' position that it is appropriate for the judiciary to delve into an administrative officer's motivation, and if his action can be ascribed to an ulterior purpose, then such action may be voided regardless of whether it has a rational basis. Yet, it would be an undesirable precedent to permit an examination into what transpired in the deepest recesses of the Commissioner's mind to override consideration of whether the Commissioner was empowered to adopt the regulation. On the contrary, the real issue here is the authority of the Commissioner of Health, and any speculation as to his underlying motivation is simply irrelevant. In the final analysis, the extent of drug abuse and the attendant danger to society is a medical opinion within the discretion of the Commissioner, whose expertise on the subject must be accorded due deference. According to the Court of Appeals in *Ostrer v Schenck* (41 NY2d 782, 786): "The function of a reviewing court is a limited one. The challenger of a regulation must establish that the regulation 'is so lacking in reason for its promulgation that it is essentially arbitrary.' *(Matter of Marburg v Cole,* 286 NY 202, 212.) The interpretation given a statute by the administering agency 'if not irrational or unreasonable, should be upheld.' *(Matter of Howard v Wyman,* 28 NY2d 434, 438.) As was observed in *Mississippi Val. Barge Co. v United States* (292 US 282, 286-287), '[t]he judicial function is exhausted when there is found to be a rational basis for the conclusions approved by the administrative body.' "

The expert opinion introduced at the Public Health Council hearing, as well as that generally relied upon by the Commissioner of Health, is certainly more than adequate to demonstrate a real and pervasive societal problem with respect to

the illegal diversion and use of benzodiazepines with its causal relationship to unnatural deaths, addiction, suicide, emergency room admissions and other abuse. Further, there does not appear to be any doubt regarding the value of the official New York State prescription forms in gathering information for statistical analysis and in uncovering specific instances of the diversion of benzodiazepines into illegal channels. The use of the triplicate system, and the computers into which information from these forms are fed, may provide the principal, if not only, means to trace and identify both patients who obtain multiple prescriptions and physicians who do not always comply with their responsibility to prescribe these substances "in good faith". Similarly, there is no dispute that New York State prescription forms are more difficult to forge than are regular prescriptions, and this in itself is efficacious in curtailing diversions into the illicit market.

The fact that expert minds might reasonably differ concerning the peril to society posed by the easy availability of benzodiazepines and the illegal diversions of these drugs does not mean that it is the responsibility of the courts "to determine which scientific view is correct in ruling upon whether the police power has been properly exercised" *(Chiropractic Assn. v Hilleboe,* 12 NY2d 109, 114). In *Chiropractic Assn. v Hilleboe (supra),* plaintiffs had sought to invalidate a regulation under the New York State Sanitary Code prohibiting the administration of radiation by anyone not licensed or otherwise authorized to practice medicine, dentistry, podiatry or osteopathy. In upholding the regulation, the Court of Appeals, citing *Matter of Viemeister v White* (179 NY 235), declared that " '[w]hen the sole object and general tendency of legislation is to promote the public health, there is no invasion of the Constitution, even if the enforcement of the law interferes to some extent with liberty or property' " *(supra,* 12 NY2d, at 115). The Court of Appeals reached the same conclusion in *Pharmaceutical Mfrs. Assn. v Whalen* (54 NY2d 486) when it rejected a due process attack on the Generic Drug Substitution Law (L 1977, ch 776). Although that case involved a challenge to a statute rather than, as here, an administrative rule, the reasoning of the court therein *(supra,* at 493) is instructive:

"Although plaintiffs concede that this State has a legitimate interest in providing safe and effective drugs to its citizens at the lowest possible price, they assert that the Law is not rationally related to the attainment of this objective. Specifi-

cally, plaintiffs contend that the factual assumption underlying the Law—that generic drug products approved by the FDA are therapeutically equivalent to and may be safely substituted for their brand name counterparts—is not based on competent pharmacological and medical data and, therefore, that the Law is an unreasonable exercise of the police power. According to plaintiffs, the Legislature failed to make any independent findings concerning the therapeutic equivalence, safety and efficacy of generic drugs and, instead, unreasonably adopted the FDA's findings as to drug product substitution. Relying on various affidavits, scientific studies, documentary evidence and the opinion of their own pharmacological expert, plaintiffs assert that questions of fact exist as to the therapeutic equivalence and safety of drug products on the Department of Health's substitution list which must be developed at trial. We find all of plaintiffs' contentions to be without merit.

"The principles of law applicable to the facts of this case are by now well established. Where a police power enactment is challenged on due process grounds, the test is whether there is ' "some fair, just and reasonable connection" between it and the promotion of the health, comfort, safety and welfare of society.' (*Montgomery v Daniels,* 38 NY2d 41, 54.)"

Applying the foregoing standard, it is evident that plaintiffs have not made an adequate showing that the regulation at issue lacks a rational basis. Since the regulation is reasonably related to the purpose for which it was adopted and, in addition, is in conformity with the avowed legislative intention to control the illegal "flow of dangerous drugs into and within the state" in order "to protect the public and prevent unlawful access to dangerous drugs", it is entirely beside the point whether or not the Commissioner's approach to the problem of substance abuse and illicit diversion is the best one possible under the circumstances, or another method would have been preferable. Certainly, it is not the function of the courts to question the judgment of the Commissioner of Health with respect to a matter which is within his particular expertise.

### IRREPARABLE HARM

The regulation, moreover, is not only expressly authorized by section 3338 (3) of the Public Health Law, but it is narrowly drawn for minimum impact upon both physicians and

patients. Physicians are not at all prohibited from prescribing benzodiazepines to persons having a legitimate medical need for such medication, and, indeed, they are no more circumscribed in either their treatment of patients nor their prescribing practices than they have ever been. The extra expense and paperwork required for the triplicate system, even if such a matter can weigh against society's interest in promoting the health and welfare of the general public, appears to be minor. While it is true that unlike the situation with traditional prescription forms, no refills are permitted, there is nothing to prevent the practitioner from issuing another 30- or 90-day supply if he or she deems it medically sound to rely on a previous physical examination. To the extent that some physicians might be unwilling to write another prescription in the absence of a new examination, certain patients, including the elderly, might benefit from more encounters with their doctor. At any rate, nothing in the regulation compels a personal delivery of the prescription by the practitioner to the patient. Only the sound medical practice and judgment of the individual practitioner will govern the frequency of office visits.

### RIGHT TO PRIVACY

Plaintiffs further urge that the regulation improperly intrudes upon the patients' right of privacy. However, the decision by the United States Supreme Court in *Whalen v Roe* (429 US 589) has already disposed of the claim that the triplicate system violates the right to confidentiality. That case presented a constitutional challenge to the triplicate system mandated by the New York State Controlled Substances Act with respect to Schedule II substances. In considering the issue of whether the State could record in a centralized computer file the names and addresses of all persons who have obtained a prescription for certain drugs for which there is both a lawful and unlawful market, the court asserted *(supra,* at 597-598):

"State legislation which has some effect on individual liberty or privacy may not be held unconstitutional simply because a court finds it unnecessary, in whole or in part. For we have frequently recognized that individual States have broad latitude in experimenting with possible solutions to problems of vital local concern.

"The New York statute challenged in this case represents a

considered attempt to deal with such a problem * * * It was recommended by a specially appointed commission which held extensive hearings on the proposed legislation, and drew on experience with similar programs in other States. There surely was nothing unreasonable in the assumption that the patient-identification requirement might aid in the enforcement of laws designed to minimize the misuse of dangerous drugs. For the requirement could reasonably be expected to have a deterrent effect on potential violators as well as to aid in the detection or investigation of specific instances of apparent abuse. At the very least, it would seem clear that the State's vital interest in controlling the distribution of dangerous drugs would support a decision to experiment with new techniques for control * * * It follows that the Legislature's enactment of the patient-identification requirement was a reasonable exercise of New York's broad police powers."

The Supreme Court then proceeded to reject the argument that the triplicate system constituted an invasion of confidentiality. In the opinion of the court, "the New York program does not, on its face, pose a sufficiently grievous threat to * * * establish a constitutional violation" (Whalen v Roe, supra, at 600) to either of the two separate facets of the protected "zone of privacy", one being the individual interest in avoiding disclosure of personal matters and the second being the right of persons to make their own decisions in important private matters. Discussing the statutory safeguards against improper disclosure of patient information, the court concluded that there was no support in the record, or in the experience of other States having similar laws, to assume that these provisions would be administered improperly. Furthermore, "disclosures of private medical information to doctors, to hospital personnel, to insurance companies, and to public health agencies are often an essential part of modern medical practice even when the disclosure may reflect unfavorably on the character of the patient. Requiring such disclosures to representatives of the State having responsibility for the health of the community, does not automatically amount to an impermissible invasion of privacy" (Whalen v Roe, supra, at 602). As for the right of individuals to make independent personal decisions with the advice of their physicians regarding the use of medication, "[a]lthough the State no doubt could prohibit entirely the use of particular Schedule II drugs, it has not done so. This case is therefore unlike those in which the Court held that a total prohibition of certain

conduct was an impermissible deprivation of liberty. Nor does the State require access to these drugs to be conditioned on the consent of any state official or other third party. Within dosage limits which appellees do not challenge, the decision to prescribe, or to use, is left entirely to the physician and the patient" *(Whalen v Roe, supra,* at 603).

The instant situation is precisely the same as that existing in *Whalen v Roe (supra),* except that the specific substances involved are different. Clearly, the reasoning of the United States Supreme Court in that case is no less applicable because the drugs for which New York State prescription forms are now being required are benzodiazepines. The statutory protections against improper disclosure are in force regardless of the particular substances at issue, and if there is no violation of the right to confidentiality insofar as Schedule II drugs are concerned, then the right to confidentiality remains equally unabridged with respect to benzodiazepines. The procedures in both instances are identical. At any rate, in *Pharmaceutical Mfrs. Assn. v Whalen* (54 NY2d 486, *supra),* the New York Court of Appeals, discussing the claimed right to privacy between pharmacist and patient, declared (at 496): "Finally, the Law suffers no constitutional infirmity by reason of abridging some ephemeral 'right to privacy between pharmacist and patient.' In the first place, it is doubtful whether any such right exists, and plaintiffs have cited no authority to support the proposition that it does. True, the Supreme Court has recognized a constitutional 'interest in independence in making certain kinds of important decisions' *(Whalen v Roe,* 429 US 589, 599-600), including a patient's 'right to decide independently, with the advice of his physician, to acquire and use needed medication' *(Whalen v Roe, supra,* at p 603). Even though the ' "outer limits" of the decision-making aspect of the right to privacy "have not been marked by the Court" ' *(People v Onofre,* 51 NY2d 476, 486, quoting *Carey v Population Servs. Int.,* 431 US 678, 684-685), the right to privacy typically has been held to encompass only 'matters relating to marriage, procreation, contraception, family relationships, and child rearing and education.' *(Paul v Davis,* 424 US 693, 713.)"

Although the patient-doctor relationship is more sacrosanct than that between patient-pharmacist, the fact is that compelling a practitioner to make out one type of prescription form rather than another is hardly an infringement on confidentiality. Information derived from New York State prescriptions is strictly protected from public disclosure, and there is no

indication, or even allegation, that the State of New York or any of its agents has failed to comply with the statutory safeguards. There is, thus, simply no merit to plaintiffs' claim that the subject regulation constitutes an unconstitutional violation of the right to privacy.

### DELEGATION OF AUTHORITY

Plaintiffs also contend that section 3338 (3) of the Public Health Law is an unconstitutional delegation of legislative power, citing *Rapp v Carey* (44 NY2d 157) wherein the Court of Appeals observed that "even the Legislature is powerless to delegate the legislative function unless it provides adequate standards" (at 162). As a general rule, "[t]he Legislature may constitutionally confer discretion upon an administrative agency only if it limits the field in which that discretion is to operate and provides standards to govern its exercise. This does not mean, however, that a precise or specific formula must be furnished in a field where flexibility and the adaptation of the legislative policy to infinitely varying conditions constitute the essence of the program. The standards or guides need only be prescribed in so detailed a fashion as is reasonably practicable in the light of the complexities of the particular area to be regulated, since necessity fixes a point beyond which it is unreasonable and impracticable to compel the Legislature to prescribe detailed rules" *(Matter of Levine v Whalen,* 39 NY2d 510, 515).

Contrary to plaintiffs' assertion that Public Health Law § 3338 (3) is an unconstitutionally broad delegation of authority, it is difficult to perceive of a more specific grant of administrative power since the statute expressly permits the Commissioner of Health to require an official New York State prescription form to be used for dispensing Schedule III or Schedule IV substances. Indeed, the provision in question entails almost no exercise of discretion on the part of the Commissioner. The various benzodiazepines are all listed in Schedule IV, and the procedures involving the triplicate system are described in detail in the statute. Therefore, the only decision necessary is whether, in the view of the Commissioner, the general health and welfare of the public warrants imposition of the triplicate system to substances other than those contained in Schedule II. Since the Commissioner is considered to possess an expertise in his field, and section 3308 (2) of the Public Health Law empowers the Commis-

sioner to "make any rules, regulations and determinations which in his judgment may be necessary or proper to supplement the provisions of this article to effectuate the purposes and intent thereof", it can hardly be found that the Commissioner herein promulgated the subject regulation without any underlying legislative standard.

Plaintiffs' position also receives no support from the recent case of *Boreali v Axelrod* (71 NY2d 1), wherein the Court of Appeals determined that the Public Health Council exceeded its lawfully delegated authority when it adopted a sweeping code to govern tobacco smoking in public areas. According to the court therein, "[w]hile the Legislature has given the Council broad authority to promulgate regulations on matters concerning the public health, the scope of the Council's authority under its enabling statute must be deemed limited by its role as an administrative, rather than a legislative, body" (at 6). However, unlike the situation present therein, the Commissioner of Health in the instant matter did not create "its own comprehensive set of rules without benefit of legislative guidance" *(Boreali v Axelrod, supra,* at 13) in an area in which the Legislature had repeatedly failed to reach agreement. Rather, the Commissioner's action was in compliance with a specific legislative delegation expressing a clear legislative policy.

### STATE ADMINISTRATIVE PROCEDURE ACT

Plaintiffs, in addition, assert that the regulation contravenes sections 202-a and 202-b of the State Administrative Procedure Act, which establish certain procedures which an agency must follow in promulgating rules and regulations. Thus, pursuant to section 202-a (1), "[i]n developing a rule, an agency shall, to the extent consistent with the objectives of applicable statutes, consider utilizing approaches which are designed to avoid undue deleterious economic effects or overly burdensome impacts of the rule upon persons directly or indirectly affected by it". Section 202-a also obligates each agency to issue a regulatory impact statement setting forth the statutory authority for the proposed regulation, the needs and benefits to be derived therefrom, the anticipated costs, the expected paperwork, whether it duplicates any related State and Federal requirements and if alternative approaches were considered. Section 202-b (1) states that the agency must "consider utilizing approaches that will accomplish the objec-

tives of applicable statutes while minimizing any adverse economic impact of the rule on small businesses" and also mandates that the agency prepare a regulatory flexibility analysis indicating compliance therewith.

Notwithstanding plaintiffs' claim that these provisions were violated herein, it is clear that the Commissioner did not depart from the dictates of the State Administrative Procedure Act. This is demonstrated not only by the notice published in the New York State Register but by the fact that the record reveals that the Commissioner did consider and reject alternative approaches to the one ultimately selected. It is not, as previously noted, the function of the courts to review the wisdom of an administrative decision which is rationally based, nor are we here to second-guess the Commissioner's choice among the various options which may have been available to him. As a related argument, plaintiffs complain that the failure to provide them with a hearing was a violation of due process. In that connection, it need only be stated that while there is no constitutional or statutory right to a pre-enactment hearing in a situation such as the present one, the Public Health Council did conduct a hearing prior to the promulgation of the regulation.

### INTERSTATE COMMERCE

Finally, plaintiffs allege that the regulation places an unconstitutional burden upon interstate commerce because it will vastly decrease the number of out-of-State benzodiazepine prescriptions which may be filled by pharmacists in New York. It is plaintiffs' position that physicians practicing in neighboring States will be discouraged from obtaining New York State prescription forms if the result is to have their names put into the surveillance files of the New York State Health Department, and this will have a deleterious impact on both patients and pharmacists who reside near State borders. However, plaintiffs in *Pharmaceutical Mfrs. Assn. v Whalen (supra)* made a similar Commerce Clause argument with respect to the Generic Drug Substitution Law, and the Court of Appeals aptly observed, "[t]he Law does not discriminate between in-State and out-of-State manufacturers and, as discussed earlier, it serves a legitimate State interest by providing New York patients with the benefits of low-priced medication. Plaintiffs have come forth with no showing that

'the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.' *(Pike v Bruce Church,* 397 US 137, 142.)" *(Supra,* 54 NY2d, at 495.) The State's interest in controlling the distribution of dangerous substances outweighs any possible incidental effect upon interstate commerce. At any rate, the regulation is not discriminatory against practitioners or patients outside of New York, and, moreover, if it is not a violation of interstate commerce to require official New York State prescription forms for Schedule II drugs, how can such a violation be said to exist where Schedule IV drugs are concerned. The procedure is certainly the same in both instances.

The majority's opinion is implicitly an expression of their disfavor with the policy decision of the Commissioner of Health rather than an appropriate legal evaluation of whether the administrative action herein has a rational basis, an essential factor which they virtually ignore. Courts simply do not possess the authority to substitute their policy preferences for that of administrative officers, and this is particularly the case wherein specialized knowledge is required. Surely, the Commissioner of Health is better equipped to deal with important medical issues than are Judges. Since plaintiffs have failed to establish a clear likelihood of success on the merits, irreparable harm and a balance of the equities in their favor, the preliminary injunction was improperly granted.

Consequently, the order of the Supreme Court, New York County (Edith Miller, J.), entered on December 3, 1987, which *sua sponte* converted the instant declaratory judgment action into a proceeding pursuant to CPLR article 78 and granted plaintiffs' application for a preliminary injunction, should be reversed, on the law, the application for a preliminary injunction denied and the matter restored to a declaratory judgment action, without costs or disbursements.

ELLERIN, J., concurs with ASCH, J.; KUPFERMAN, J. P., concurs in an opinion; SULLIVAN and MILONAS, JJ., dissent in part in an opinion by MILONAS, J.

Order, Supreme Court, New York County, entered on December 3, 1987, modified, on the law, to restore the matter to a declaratory judgment action, and otherwise affirmed, without costs and without disbursements.